[S. F. No. 17015. In Bank. Dec. 30, 1944.]

JOSEPH JAMES, Respondent, v. MARINSHIP CORPORA-
TION (a Corporation) et al., Appellants.

Thelen, Marrin, Johnson & Bridges, Charles J. Janigian and George M. Naus for Appellants.

Joseph A. Padway, Herbert S. Thatcher and Clarence E. Todd as Amici Curiae on behalf of Appellants.

Andersen & Resner, George R. Andersen, Herbert Resner and Thurgood Marshall for Respondent.

Katz, Gallagher & Margolis, Ben Margolis, John T. McTernan, Arthur Garfield Hays, Osmond K. Fraenkel, Nathan Greene, Stanley Fleischman, Theodore Stuart, Wayne M. Collins, Herbert Ganahl, Thomas L. Griffith, Jr., Morris M. Grupp, Carey McWilliams, Loren Miller, George G. Olshausen, Clarence E. Rust, Clore Warne and A. L. Wirin, as Amici Curiae on behalf of Respondent.

GIBSON, C. J.—This is an appeal from an order of the Superior Court in Marin County awarding a preliminary injunction which, among other things, restrained defendants from discharging or causing the discharge of plaintiff, and

other Negro employees because they are not members of a labor union with which their employer has a closed shop agreement, but which will not grant Negroes full membership privileges. The basic question presented is whether a closed shop may be enforced by a labor union together with an arbitrarily closed or partially closed union membership.

Plaintiff, Joseph James, is a citizen of the United States, a resident of California, a member of the Negro race, and an employee of defendant Marinship Corporation. He brought this action on his own behalf and on behalf of approximately 1,000 other Negro workers similarly situated. The Negroes are skilled craftsmen in the shipbuilding trade, most of whom have been employed by Marinship for periods in excess of one year.

Defendant Marinship is a Nevada corporation which operates yards for the construction of ships at Sausalito in Marin County. The shipyards are owned by the United States and are operated by Marinship under contracts containing provisions that Marinship will not discriminate against any worker because of race, color, creed, or national origin.

The defendant International Brotherhood of Boilermakers, Iron Shipbuilders and Helpers of America (hereinafter called the International Brotherhood) is an international labor union and an unincorporated association. Local Union No. 6 of the International Brotherhood of Boilermakers, Iron Shipbuilders and Helpers of America (hereinafter called Local No. 6) is a local union chartered by and affiliated with the International Brotherhood and does business in California. Certain officials of both the International Brotherhood and Local No. 6 are also named as defendants.

There is a written contract or "Master Agreement" in effect between Marinship and the International Brotherhood containing a provision for a closed shop. Under this agreement the International Brotherhood "dispatches" workers for employment at Marinship through the medium and agency of Local No. 6, and workers cannot be employed there in any craft over which the International Brotherhood claims jurisdiction unless they are members in good standing in a local union or auxiliary of the International Brotherhood.

Defendant unions do not admit Negroes to membership. In 1937, the establishment of separate Negro local lodges was authorized by the International Brotherhood, and by-laws

therefor were adopted, effective as of January 1, 1938. For some time the unions dispatched Negro workers to employment without imposing any condition of union affiliation. Auxiliary A-41, one of such Negro lodges, was chartered on August 14, 1943, and defendants insisted that plaintiff and other Negro workers must join this local, pay initiation fees and dues, and remain members thereof in good standing in order to obtain work clearances for employment at Marinship. Upon their refusal to do so, the defendant unions threatened to cause their discharge, and defendant Marinship gave notice that it would discharge them within forty-eight hours unless they complied with the demand and obtained the necessary work clearances.

Plaintiff thereupon brought the present action, setting forth the foregoing facts and further alleging, in substance, that Auxiliary A-41 was not a bona fide union local and did not offer equal privileges and benefits of union membership, but instead was used as a means of discriminating against Negro workers; that they were willing to become members of Local No. 6 on equal terms with other members; that the threatened action by Marinship would constitute a breach of the anti-discrimination provisions in Marinship's contracts with the Maritime Commission; and that it would be contrary to law and public policy and harmful to the war effort. Plaintiff finally alleges that the Negroes will suffer irreparable damage, that there is no speedy or adequate remedy at law, and that injunctive relief is necessary to prevent a multiplicity of suits.

Upon the verified complaint, the trial court issued a temporary restraining order and an order to show cause why a preliminary injunction should not issue pending trial. Thereafter, Marinship Corporation, Local No. 6 and the officers of Local No. 6, who were named as defendants, filed demurrers upon the grounds, among others, that the trial court had no jurisdiction of the subject of the action and that the complaint did not state facts sufficient to constitute a cause of action. The record does not disclose that any pleadings were filed by the International Brotherhood or the officers thereof who were named as defendants or that they were served with process. Affidavits in opposition to issuance of a preliminary injunction were filed by William E. Walter, international secretary-treasurer of the International Broth-

erhood, by E. Medley, president of Local No. 6, and by Robert Digges, administrative manager of Marinship.

It is asserted in the Medley affidavit, among other things, that Local No. 6 does not supervise the affairs of Auxiliary A-41 *except* as provided in the By-laws Governing Auxiliary Lodges; that business agents of Local No. 6 act impartially and with equal zeal for members of both locals; that there has been no discrimination with respect to employment opportunities; that many Negroes have advanced from the rank of helpers to that of trainees and journeymen and that some have become leadermen; and that Marinship and Local No. 6 have, whenever possible, assisted Negroes to advance.

The affidavit of Marinship states that in 1941 the "Master Agreement" was executed by the management of practically every shipyard on the Pacific Coast and by the Metal Trades Department of the American Federation of Labor and by a number of unions affiliated with said department, including the defendant International Brotherhood; that under the contract no worker, regardless of race or color, can obtain, or continue in, employment unless he obtains a clearance card from the appropriate union; that Marinship does not look behind a notice from the union that an employee is no longer in good standing with the union; that the company is aware of a controversy between the union and the Negro employees, but since the controversy involves the internal affairs of the union it has refrained from taking a position one way or the other; that it has received notices from the union that certain Negroes are not members in good standing, which notices it has accepted at face value; and that it "has performed its obligations under the union shop clause of the Master Agreement in the case of the Negroes as it has in the case of white men." The affidavit further states that Negroes employed by Marinship "work under the terms of the Master Agreement and are paid the same wages, work the same hours, and are employed under the same working conditions as all other workers, irrespective of race, creed, color or national origin."

On February 17, 1944, the trial court issued a preliminary injunction which restrained Local No. 6, its officers and agents, and Marinship Corporation, but did not restrain the International Brotherhood or its officials. The order recites that the actions of the union in discriminating against and segregat-

ing Negroes into auxiliary unions are contrary to the public policy of the State of California and that the closed shop provision of the Master Agreement "is void as applied to the plaintiffs in this case, and others similarly situated." It restrained *Local No. 6 and its officers and agents* (1) from compelling the Negroes to join or pay initiation fees, dues, or other moneys to Auxiliary A-41 or other subsidiary or auxiliary union or organization of the International Brotherhood; (2) from compelling, inducing, or requesting Marinship to discharge or refuse to employ the Negroes because of their refusal to become or remain members or pay dues; (3) from preventing employment at Marinship of the Negroes because of their nonmembership or refusal to pay dues; (4) from "refusing to admit into membership in said Local 6 on the same terms and conditions as white persons, or refusing to accept tendered initiation fees and dues to said Local 6 from, plaintiff and other Negro workers similarly situated"; (5) from refusing to give work clearances to Negroes who fail to join or pay dues; and (6) from attempting to enforce the By-laws Governing Auxiliary Lodges of the International Brotherhood. The order restrained *Marinship Corporation* from discharging or refusing to employ the Negroes because they did not have work clearances from or were not members of the International Brotherhood, Local No. 6 thereof, or Auxiliary A-41, but provided that if the Negroes were accepted into full membership and upon the same terms and upon an equal basis with white persons they should be required to obtain and present work clearances to Marinship from Local No. 6.

■ It should be recognized at the outset that a union may use the various forms of concerted action, such as strike, picketing, or boycott, to enforce an objective that is reasonably related to any legitimate interest of organized labor. (See, for example, *Emde* v. *San Joaquin County etc. Council*, 23 Cal.2d 146, 155 [143 P.2d 20, 150 A.L.R. 916] ; *McKay* v. *Retail Auto. S. L. Union No.* 1067, 16 Cal.2d 311 [106 P.2d 373] ; *C. S. Smith Met. Market Co.* v. *Lyons*, 16 Cal.2d 389 [106 P.2d 414] ; *Fortenbury* v. *Superior Court*, 16 Cal.2d 405 [106 P.2d 411] ; *J. F. Parkinson Co.* v. *Building Trades Council*, 154 Cal. 581 [98 P. 1027, 16 Ann.Cas. 1165, 21 L.R.A.N.S. 550].)

■ It is equally well settled that the object of concerted labor activity must be proper and that it must be sought by law-

ful means, otherwise the persons injured by such activity may obtain damages or injunctive relief. (See *McKay* v. *Retail Auto. S. L. Union No. 1067*, 16 Cal.2d, *supra*, at 319, 331; *C. S. Smith Met. Market Co.* v. *Lyons*, 16 Cal.2d, *supra*, at 395, 399-401; *Fortenbury* v. *Superior Court*, 16 Cal.2d, *supra*, at 409; *Magill Bros.* v. *Building Service etc. Union*, 20 Cal.2d 506 [127 P.2d 542]; *Burlington Transp. Co.* v. *Hathaway*, — Iowa — [12 N.W.2d 167, 149 A.L.R. 1243]; *Markham & Callow, Inc.* v. *International Woodworkers*, 170 Ore. 517 [135 P.2d 727]; *Fashioncraft, Inc.* v. *Halpern*, 313 Mass. 385 [48 N.E.2d 1]; *Retail Clerks' Union* v. *Wisconsin Emp. Rel. Board*, 242 Wis. 21 [6 N.W.2d 698]; *Wisconsin E. R. Bd.* v. *Milk & Ice Cream D. & D. E. Union*, 238 Wis. 379 [299 N.W. 31], certiorari den. 316 U.S. 668 [62 S.Ct. 1035, 86 L.Ed. 1744]; *Opera on Tour* v. *Weber*, 285 N.Y. 348 [34 N.E.2d 349, 136 A.L.R. 267], certiorari den. 314 U.S. 716 [62 S.Ct. 477, 86 L.Ed. 570]; Restatement, Torts, §§ 775, 784 et seq.; 31 Am.Jur. 934-5, 948-9; (1943) 41 Mich.L.Rev. 1143-1164; 90 U. of Pa.L.Rev. 227, 229.)

 Although recent decisions in the United States Supreme Court hold that a state cannot deprive labor unions of the right of free speech through peaceful picketing (see *Thornhill* v. *Alabama*, 310 U.S. 88 [60 S.Ct. 736, 84 L.Ed. 1093]; *Carlson* v. *California*, 310 U.S. 106 [60 S.Ct. 746, 84 L.Ed. 1104]; *American Fed. of Labor* v. *Swing*, 312 U.S. 321 [61 S.Ct. 568, 85 L.Ed. 855]; *Cafeteria Employees Union* v. *Angelos* (1943), 320 U.S. 293 [64 S.Ct. 126, 88 L.Ed. 58]), these decisions do not deny a state the power to protect against abuses of the right. In two recent cases the court upheld the state's power to limit peaceful picketing both as to place and as to the economic relationship of the industry picketed *(Allen Bradley Local No. 1111* v. *Wisconsin E. R. Board*, 315 U.S. 740 [62 S.Ct. 820, 86 L.Ed. 1154]; *Carpenters & Joiners Union* v. *Ritter's Cafe*, 315 U.S. 722 [62 S.Ct. 807, 86 L.Ed. 1143]), and in *Milk Wagon Drivers Union* v. *Meadowmoor Dairies*, 312 U.S. 287 [61 S.Ct. 552, 85 L.Ed. 836, 132 A.L.R. 1200], a state court injunction restraining peaceful picketing was sustained where there was danger of continued violence. In *Dorchy* v. *Kansas*, 272 U.S. 306 [47 S.Ct. 86, 71 L.Ed. 248], Mr. Justice Brandeis, speaking for the court, stated (p. 311): "But a strike may be illegal because of its purpose, however orderly the manner in which it is conducted. To collect a stale

claim due to a fellow member of the union who was formerly employed in the business is not a permissible purpose.'' The Dorchy case has never been overruled and it has been cited with approval in two of the free speech decisions. *(Thornhill v. Alabama,* 310 U.S. 88, *supra,* at 103-104; *Carpenters & Joiners Union* v. *Ritter's Cafe,* 315 U.S. 722, *supra,* at 725.) Also in *Senn* v. *Tile Layers P. Union,* 301 U.S. 468 [57 S.Ct. 857, 81 L.Ed. 1229], the leading case associating picketing with the right of free speech, the court, while affirming the action of a state court in refusing to enjoin picketing to compel Senn to stop working with his own hands, stated (p. 481): "Whether it was wise for the State to permit the unions to do so is a question of its public policy—not our concern. The Fourteenth Amendment does not prohibit it.'' Thus a state may impose limitations upon picketing or other concerted action if the "end sought" is not permissible under state law and public policy, though any such limitations are subject to review by the United States Supreme Court, and will be annulled if they unreasonably interfere with labor's right to publicize the facts of a labor dispute.

The fundamental question in this case is whether a closed union coupled with a closed shop is a legitimate objective of organized labor. The defendants contend in effect that a union may, for any arbitrary reason whatsoever, entirely close its membership to otherwise qualified persons and at the same time may, by enforcing a closed shop contract, demand union membership as a condition to the right to work. To support this contention they argue, first, that a closed shop is lawful in California, and, second, that private, voluntary associations such as labor unions have always had the right to limit membership to persons mutually acceptable. The first proposition, the legality of a closed shop agreement in California, is conceded by plaintiff, and this court has held that a union may use economic pressure to enforce a demand therefor even though the employees in the picketed shop do not belong to the union and have no dispute with their employer. *(McKay* v. *Retail Auto. S. L. Union No. 1067,* 16 Cal.2d 311, *supra; Shafer* v. *Registered Pharmacists Union,* 16 Cal.2d 379 [106 P.2d 403]; *C. S. Smith Met. Market Co.* v. *Lyons,* 16 Cal.2d 389, *supra; cf. J. F. Parkinson Co.* v. *Building Trades Council,* 154 Cal. 581, *supra.)* It does not follow, however, that a union may maintain *both* a closed shop

agreement or other form of labor monopoly together with a closed or partially closed membership. We have found no case in this state that supports such a right and there is no decision of the United States Supreme Court that compels its recognition as a proper labor objective. The case of *Greenwood* v. *Building Trades Council,* 71 Cal.App. 159 [233 P. 823], cited by defendants, involved a dispute between rival local unions, one of which sought to compel its reinstatement as member of a building trades council, an organization composed of a number of local unions. The court refused to compel reinstatement of the excluded local and, further, refused to restrain the building trades council from calling strikes in shops employing members of such local. The decision on its facts does not involve the right of any individual to become a member of either the building trades council or its member locals, and there is nothing to indicate that any individual applicants were denied membership by such locals.

In our opinion, an arbitrarily closed or partially closed union is incompatible with a closed shop. Where a union has, as in this case, attained a monopoly of the supply of labor by means of closed shop agreements and other forms of collective labor action, such a union occupies a quasi public position similar to that of a public service business and it has certain corresponding obligations. It may no longer claim the same freedom from legal restraint enjoyed by golf clubs or fraternal associations. Its asserted right to choose its own members does not merely relate to social relations; it affects the fundamental right to work for a living. (See Newman, *The Closed Union and the Right to Work* (1943), 43 Columb.L.Rev. 42, 44; Northrup, *Organized Labor and the Negro* (1944), 238-239; Chaffee, *The Internal Affairs of Associations* (1930), 43 Harv. L.Rev. 993, 1021-1023; Mintz, *Trade Union Abuses* (1932), 6 St. John'sL.Rev. 272, 274-276; (1941) 40 Mich.L.Rev. 310.)

In *Wilson* v. *Newspaper & Mail Deliverers' Union* (1938), 123 N.J.Eq. 347 [197 A. 720], plaintiff's employer entered into a contract with the defendant union for a closed shop. Plaintiff and other nonunion employees applied for union membership but were rejected. Thereafter the union notified the employer that it was breaking its contract by hiring plaintiff. The court, in issuing an injunction, held that the union could either restrict its membership at pleasure or contract with employers that all work shall be given to its members,

but that it could not do both. At page 722 the court said that: ". . . monopolistic, closed shop contracts of an exclusive, restricted-membership union, are counter to our policy; the restriction of membership extends the effect of such contracts beyond the reasonable protection of the members." The court also said that the union had created a monopoly of employment, and that a "monopoly raises duties which may be enforced against the possessors of the monopoly. This has been recognized from earliest times. The rule that one who pursued a common calling was obliged to serve all comers on reasonable terms, seems to have been based on the fact that innkeepers, carriers, farriers, and the like, were few, and each had a virtual monopoly in his neighborhood. 17 Harv. Law R. 156. A monopoly is under a common-law duty to charge only reasonable rates. . . . The question presented in the instant case is not one of prices or of serving the public but one of employment. . . . However, the principle is the same; the holders of the monopoly must not exercise their power in an arbitrary, unreasonable manner so as to bring injury to others. The nature of the monopoly determines the nature of the duty. Everyone must be left free to pursue his lawful calling; that is fundamental. It seems to me necessarily to follow that the union must either surrender its monopoly or else admit to membership all qualified persons. . . . Otherwise such persons are, by the act of the union, deprived of the right to earn a livelihood."

In *Dorrington* v. *Manning* (1939), 135 Pa.Super. 194 [4 A.2d 886], the defendant union secured a closed shop agreement and, at about the same time, rejected membership applications of plaintiffs, employees in the shop. Thereafter the union caused the discharge of plaintiffs by calling a strike. The trial court enjoined the union from preventing plaintiffs' reinstatement as employees, and upon appeal the order was affirmed, the court holding that "defendants' conduct, with no apparent lawful purpose, constituted a malicious and unlawful interference with plaintiffs' employment" (p. 892 [4 A.2d]). In *Carroll* v. *Local No. 269* (1943), 133 N.J.Eq. 144 [31 A.2d 223, 225], the court said: "It has been held in this state that although a monopoly of labor opportunity is a permissible objective and realization of a union, unions obtaining such monopolies must be democratic and admit to their membership all those reasonably qualified for their trade.

. . . Otherwise such persons by the act of the union would be deprived of their constitutional right to earn a livelihood. A voluntary union should be one in which a law-abiding individual of good moral character, possessing the essential qualification of his trade, can enter upon compliance with rules and by-laws reasonably appropriate for the stability and usefulness of the association. Autocracy is no less inimical to our American ideals if practiced by many rather than by one. Since 1890 we have regarded labor unions as voluntary associations. Let them in reality continue to be such. If the union can force a closed shop upon all, or almost all, of the employers of an industry or area, the right to employment will depend upon union membership; and if union membership be refused the workman, he is more totally excluded from the opportunity to labor than he was before union recognition.''

The Restatement, Torts, section 810, states: ''Workers who in concert procure the dismissal of an employee because he is not a member of a labor union satisfactory to the workers are . . . liable to the employee if, but only if, he desires to be a member of the labor union but membership is not open to him on reasonable terms.'' Many other authorities have disapproved a closed shop coupled with an arbitrarily closed union. (See *Schwab* v. *Moving Picture Mach. Operators Local* (1941), 165 Ore. 602 [109 P.2d 600]; *Lucke* v. *Clothing Cutters' & T. Assembly No. 7507, K. of L.*, 77 Md. 396 [26 A. 505, 39 Am.St.Rep. 421, 19 L.R.A. 408]; *Wills* v. *Local No. 106*, 26 Ohio N.P.N.S. 435; *Shinsky* v. *O'Neil*, 232 Mass. 99 [121 N.E. 790, 792]; *Brown* v. *Lehman* (1940), 141 Pa.Super. 467 [15 A.2d 513, 517]; 1 Teller, Labor Disputes and Collective Bargaining (1940), § 99, pp. 284-285; Newman, *The Closed Union and the Right to Work* (1943), 43 Columb.L.Rev. 42; Despres, *The Collective Agreement for the Union Shop* (1939), 7 U. of Chicago L.Rev. 24, 34-35; Fraenkel, *One Hundred and Fifty Years of the Bill of Rights* (1939), 23 Minn.L.Rev. 718, 767; Witmer, *Collective Labor Agreements* (1938), 48 Yale L.J. 195, 219; (1941) 40 Mich.L.Rev. 310; (1940) 49 Yale L.J. 754, 760.)

In *Walter* v. *McCarvel* (1941), 309 Mass. 260 [34 N.E.2d 677], an action was dismissed where plaintiff sought to enjoin the defendant union from attempting to enforce a closed shop provision or, in the alternative, to require the union to admit

plaintiff to membership, the court holding that these facts alone were not sufficient to show a plan by the union to obtain a monopoly over the labor market. In the present case, however, it is clear that the International Brotherhood, together with its locals, does have a monopoly by virtue of its "Master Agreement" signed by practically every Pacific Coast shipyard. We need not determine at this time, therefore, whether or not a court can properly prohibit a union's efforts to enforce discriminatory or arbitrary rules for admission if the union does not hold a labor monopoly in the locality. It should be noted, however, that some states, by statute, have declared *all* labor unions to be affected with a public interest and thus subject to regulation. (Ala. Gen. Acts (1943), p. 252; Laws of Florida (1943), p. 565; Texas Gen. Laws (1943), p. 180; see, also, Pa. Stat. Ann. (Purdon, 1941), tit. 43, § 211.6(1)(c), and Laws of Wis. (1939), ch. 57, § 111.06(1)(c), restricting closed shop agreements where a union unreasonably refuses to admit workers already employed at the time the agreement was made.) In New York it is a misdemeanor for *any* labor organization to deny membership or equal treatment to any person because of race, color or creed. (N.Y. Civ. Rights Law, § 43 (1940); (1940) 53 Harv.L.Rev. 1215; *cf.* Laws of Kan. (1941), c. 265; Pa. Stats. Ann. (Purdon, 1941), tit. 43, § 211.3 (f).) The New York statute has been held constitutional and applicable to an association of railway postal clerks employed in the "United States Railway Mail Service." (*Railway Mail Association* v. *Corsi* (1944), —— N.Y. —— [56 N.E.2d 721].)

Some courts have held that state legislation is necessary in order to announce a public policy restricting a union's right to arbitrarily exclude individuals from membership although as a result thereof excluded persons are unable to find employment in their chosen trade. (See, for example, *Miller* v. *Ruehl,* 166 Misc. 479 [2 N.Y.S.2d 394]; *Murphy* v. *Higgins,* 12 N.Y.S. 2d 913.) As said hereinbefore, however, other authorities have indicated that the courts, without statutory aid, may restrain such conduct by a union on the ground that it is tortious and contrary to public policy. Further, as said in 4 Restatement, Torts, page 136, comment to section 794: "The expression of public policy is not confined to legislation and criminal law; *in passing* upon the propriety of an object [of concerted labor action], public policy otherwise defined is an important factor. If the object is an act against which the law has definitely set its face, it is not a proper object of concerted action."

■ Although the shipbuilding industry may affect interstate commerce and therefore may be subject to the provisions of the National Labor Relations Act (49 Stats. 449; 29 U.S. C.A. §§ 151-166), there is nothing in the act that gives the defendant unions a right to maintain a closed or partially closed membership together with a closed shop agreement. To the contrary, a reasonable interpretation of the statute, together with its underlying policy, would seem to require that unions chosen to represent the employees must be open to all who wish to join. Section 9(a) of the act (49 Stats. 453; 29 U.S.C.A. § 159) provides: "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit. . . ." It is difficult to see how a union can fairly represent *all* the employees of a bargaining unit unless it is willing to admit all to membership, giving them the opportunity to vote for union leaders and to participate in determining union policies. Although no case so construing the National Labor Relations Act has been found, the National Labor Relations Board has declared: "We entertain grave doubt whether a union which discriminatorily denies membership to employees on the basis of race may nevertheless bargain as the exclusive representative in an appropriate unit composed in part of members of the excluded race. Such bargaining might have consequences at variance with the purposes of the Act. If such a representative should enter into a contract requiring membership in the union as a condition of employment, the contract, if legal, might have the effect of subjecting those in the excluded group, who are properly part of the bargaining unit, to loss of employment solely on the basis of an arbitrary and discriminatory denial to them of the privilege of union membership. In these circumstances, the validity under the proviso of section 8(3) of the act of such a contract would be open to serious question." (*Matter of Bethlehem-Alameda Shipyard Inc., Cases Nos. R.5693-4,* 53 N.L.R.B. 999, 1016.) To this may be added the observation of a congressional committee: "A few trade unions exclude qualified persons from membership by high initiation fees or other devices. This policy is condemned by the most important unions and is prohibited by their rules. The evidence presented to the commission shows clearly that the policy of exclusion is anti-

social and monopolistic and should be given up by those unions which practice it.'' (1 Comm. on Industrial Relations, Final Report, Sen. Doc. No. 415, 64th Cong., 1st Sess. (1916) 116.)

The United States Supreme Court has recently held that a union designated as bargaining agent by a majority of a craft or class of employees under the Railway Labor Act has a duty to exercise fairly, impartially, and without discrimination because of race, the powers conferred upon it by the act. (*Steele* v. *Louisville & Nashville R.R. Co.* (Dec. 18, 1944), —— U.S. —— [65 S.Ct. ——, 89 L.Ed. ——] ; *Tunstall* v. *Brotherhood of Locomotive Firemen and Enginemen* (Dec. 18, 1944), —— U.S. —— [65 S.Ct. ——, 89 L.Ed. ——].) The court held, specifically, that in collective bargaining and in making contracts, the statute required the union to represent Negroes, who were not eligible to union membership, without hostility and in good faith. The provisions of the Railway Labor Act and the National Labor Relations Act, insofar as pertinent here, are very similar. (*Cf.* 45 U.S.C.A. § 151 et seq., with 29 U.S.C.A. § 151 et seq.) Although the court pointed out in the Steele case that the statute did ''not deny to such a bargaining organization the right to determine eligibility to its membership,'' the right of the union to exclude persons because of race was not passed upon.

▮ Defendants argue that a union should not be compelled to admit all persons to membership, because some of such persons may have interests inimical to the union and may destroy it from within. The right of the union to reject or expel persons who refuse to abide by any reasonable regulation or lawful policy adopted by the union (*Brown* v. *Lehman* (1940), 141 Pa.Super. 467 [15 A.2d 513], *supra;* see Rest. Torts, comment b to § 810) affords it an effective remedy against such persons.

▮ We come now to the question whether the present record discloses such discrimination against Negroes as to bring the case within the scope of the rules discussed above. It is admitted that Negroes are excluded from membership in the union, that is, they cannot become members of Local No. 6. In order to work, however, they must join the Negro auxiliary, thereby accepting and consenting to be bound by the ''By-laws Governing Auxiliary Lodges.'' The defendants argue that this is merely segregation of members and not a denial of membership. But if the union imposes unreasonable and discrimina-

tory restrictions upon Negroes not placed upon members of Local No. 6, and if the auxiliary does not afford its members privileges and protection substantially equal to that afforded to the members of Local No. 6, then to compel the Negroes to join the auxiliary, upon penalty of discharge, is the equivalent of a complete denial of union membership. ■ If a union may not directly exclude certain workers, it may not do so indirectly by prescribing intolerable or unfair conditions of membership for such persons. (See *Cameron* v. *International Alliance of Theatrical Stage Employees* (1935), 118 N.J.Eq. 11 [176 A. 692, 97 A.L.R. 594], where the court, in holding that an arbitrary classification of union members was contrary to public policy, said (p. 701) : ''It is true that the juniors were not obliged to accept the status thus accorded them by the union, but it is equally true that membership in such a body, whatever its form, cannot be conditioned upon the surrender of the member's individual constitutional rights when that would not subserve the public interest. And there is, unquestionably, the suggestion of coercion here. Nonmembership would impose a penalty, however lawful, that the juniors were seeking to avoid.'' ■ Upon an examination of the record it becomes readily apparent that the membership offered to Negroes is discriminatory and unequal.

First, as alleged in the complaint, Local No. 6 ''controls, manages and supervises all of the affairs and business of Auxiliary A-41.'' Non-Negro locals are expressly declared in the by-laws to be the ''supervising'' lodges. The auxiliary, however, has no voice nor vote in the affairs of Local No. 6. The Negroes are thus deprived of the right to participate in the determination of vital union policies and, as alleged, the auxiliary has no ''authority or autonomy with respect to its own affairs.''

Second, the auxiliary is not allowed a business agent to act for its members, but must seek representation through the business agents of Local No. 6. It is also without a grievance committee to redress complaints with its employers, although under the by-laws it may have a representative on the committee of the supervising lodge. Thus, although the white workers may choose those whom they wish to represent them, the Negroes are denied the right. Contrary to the ordinary principles of the law of agency, the auxiliary does not have the undivided loyalty of its representatives, and where griev-

ances arise in which whites and Negroes have different interests, it is clear that the Negroes will not be adequately represented and the opportunity for discrimination is obvious. It is asserted by defendants that the business agents or grievance committee chosen by Local No. 6 will act for the Negroes and does act for them without favoritism. This is vigorously denied by plaintiff, but, in any event, is entirely beside the point. The important fact is that the Negroes have no right to compel them to act. Defendant union further seeks to justify the inequality upon the ground that Negroes are a minority group. While it is true that a minority may properly be outvoted, minority members are nevertheless entitled to vote and participate in the affairs of the whole group, and certainly they cannot be forced into a nonparticipating, isolated unit. It is urged by defendants that at the present time Negroes are employed under the same hours, wages and other working conditions as non-Negro employees. But one of the vital purposes of a labor union is to maintain the *continuance* of favorable conditions,—to assure some security as to future employment practices; and, under the union regulations discussed above, the auxiliary is deprived of the customary union machinery essential to watch over and check at the outset future grievances and unequal changes in working conditions fostered by either the employer or the members of the non-Negro local. This is a serious and present discrimination against Negroes, certain to become an even greater handicap when temporary war employment ceases and shipyard jobs become more scarce. Moreover, the important issue between plaintiff and the defendant union is that of discrimination against him as a *union member*. As said in *Cameron* v. *International Alliance of Theatrical Stage Employees* (1935), 118 N.J.Eq. 11 [176 A. 692], *supra,* at 701 [176 A.] (holding void and contrary to public policy a union membership contract which arbitrarily discriminated between ''junior'' and ''senior'' members): ''And it does not matter that, at the moment, the junior members have not, in fact, suffered an impairment of earning power by reason of the enforcement of this contract. If it tends to the public injury, it should be annulled without regard to whether public injury had in fact resulted.''

Third, the members of Auxiliary A-41 are dispatched to employment only through the agency of Local No. 6, and cannot obtain a change of classification of their work, that is,

promotions from helper (beginner) to journeyman (skilled craftsman) without the approval of the non-Negro local. The colored local thus has no right to control the job status of its own members, and the white workers are assured first chance at the better, more highly paid work.

Fourth, the regular union has a permanent status which the Negro local has not. It appears from the "By-laws Governing Auxiliary Lodges" that auxiliaries may be dissolved, apparently at will, by the International Brotherhood. In the case of non-Negro locals, however, it is provided that the International Brotherhood may revoke the charter of a lodge "which shall have been proven guilty of violation of this Constitution." Thus, although no such power is given over non-Negro locals, the International Brotherhood may at any time dissolve the Negro auxiliaries, destroying their right to employment together with any rights attained through past union membership. As plaintiff points out, this will place Negroes at a great disadvantage with respect to security of employment should shipyard jobs become scarce. Also, upon dissolution, all funds of the auxiliary (accumulated from fees, dues, and "taxes") must be turned in to the International Brotherhood.

The foregoing illustrations drawn from the complaint and the union rules clearly establish substantial discrimination against Negro workers who accept membership in the auxiliary local. Since they are denied union membership on terms of equality with other workers, the case is the same as if they were wholly denied the privilege of membership.

The discriminatory practices involved in this case are, moreover, contrary to the public policy of the United States and this state. The United States Constitution has long prohibited governmental action discriminating against persons because of race or color. (5th, 14th, and 15th Amendments.) It has recently been held that these provisions prohibit a political party from denying Negroes the right to vote in primary elections where, under state law, the political party is acting as an agency of the state in conducting the elections. (*Smith* v. *Allwright,* 321 U.S. 649 [64 S.Ct. 757, 88 L.Ed. 987].) And in *Steele* v. *Louisville & Nashville R. R. Co., supra,* —— U.S. —— [65 S.Ct. ——, 89 L.Ed. ——], the court held that the Railway Labor Act clothed the bargaining representative selected by employees with a power which, like that of the Legislature, is subject to limitations, and that, therefore,

such representative could not be permitted to discriminate against a minority group of employees because of race. ▮ Although the constitutional provisions have been said to apply to state action rather than to private action, they nevertheless evidence a definite national policy against discrimination because of race or color. ▮ Defendants contend that "individual invasion of individual rights" can be prohibited only by a statute of the state, and they point out that California statutes forbidding racial discrimination by private persons relate only to certain specifically enumerated businesses such as inns, restaurants, and the like, but not to labor unions (Civ. Code, §§ 51-52). It has been said, however, that such statutes, to the extent that they embrace public service businesses, are merely declaratory of the common law. (See 10 Am.Jur. 913-914; *Ferguson* v. *Gies,* 82 Mich. 358 [46 N.W. 718, 720, 21 Am.St.Rep. 576, 9 L.R.A. 589] ; cf. *People* v. *King,* 110 N.Y. 418 [18 N.E. 245, 248, 6 Am.St.Rep. 389, 1 L.R.A. 293].) ▮ It was well established at common law that innkeepers and common carriers were under a duty to furnish accommodations to all persons, in absence of some reasonable ground (see 52 L.R.A. [N.Y.] 740; 43 Am.Jur. 586-587), and if colored persons are furnished separate accommodations they must be equally safe, commodious and comfortable. (See *Chicago & Northwestern R.R. Co.* v. *Williams,* 55 Ill. 185, 189 [8 Am.Rep. 641] ; *Chiles* v. *Chesapeake & O. Ry. Co.,* 125 Ky. 299 [101 S.W. 386, 387-388, 11 L.R.A.N.S. 268] affd. 218 U.S. 71 [30 S.Ct. 667, 54 L.Ed. 936] ; *People* v. *King,* 18 N.E., *supra,* at 248; 14 C.J.S. 1170-1171; cf. *Pleasants* v. *North Beach & M. R. R. Co.,* 34 Cal. 586.) ▮ The analogy of the public service cases not only demonstrates a public policy against racial discrimination but also refutes defendants' contention that a statute is necessary to enforce such a policy where private rather than public action is involved. ▮ Where, as here, a labor union has attained a monopoly of the labor supply through closed shop agreements, such a union, like a public service business, may not unreasonably discriminate against Negro workers for the sole reason that they are colored persons. ▮ Use of economic pressure, by a union that does not admit Negroes, to compel the discharge of Negro employees may be enjoined. (*Wills* v. *Local 106,* 26 Ohio N.P.N.S. 435, *supra.*) In the Wills case the court said (p. 438) : "The ideal of all union efforts is and must be the

improvement of the social and economic condition of those who work. . . . This boycott does not appeal to this court of equity as conforming to this standard. In its last analysis it is a case of white men opposing colored men.''

In addition to these persuasive analogies, we have an express statement of national policy in Executive Order No. 9346 of the President of the United States, issued on May 27, 1943. This order declares that it is the policy of the United States to encourage full participation in the war effort of all persons regardless of race, creed, color, or national origin, that there should be no discrimination in the employment of any person in war industries because of such, and that it is the duty of all employers and all labor organizations to eliminate discrimination in regard to terms and conditions of employment or union membership because of race, creed, color, or national origin.

Defendants cite *Teague* v. *Brotherhood of Locomotive Firemen & Enginemen*, 127 F.2d 53, and *James* v. *International Brotherhood of Boilermakers*, 54 F.Supp. 94. The Teague case, however, is directly in conflict with *Steele* v. *Louisville & Nashville R. R. Co., supra,* —— U.S. —— [65 S.Ct. ——, 89 L.Ed. ——], and *Tunstall* v. *Brotherhood of Locomotive Firemen & Enginemen, supra,* —— U.S. —— [65 S.Ct. ——, 89 L.Ed. ——], and is, in effect, overruled thereby. *James* v. *International Brotherhood of Boilermakers, supra,* did not discuss the problems considered herein and, further, relied upon the Teague case. Defendants refer to certain language in *National Federation of Railway Workers* v. *National Mediation Board*, 110 F.2d 529 (certiorari denied, 310 U.S. 628 [60 S.Ct. 975, 84 L.Ed. 1399]), but this was rested upon the authority of *Grovey* v. *Townsend*, 295 U.S. 45 [55 S.Ct. 622, 79 L.Ed. 1292, 97 A.L.R. 680], which has since been expressly overruled in *Smith* v. *Allwright*, 321 U.S. 649 [64 S.Ct. 757, 88 L.Ed. 987], *supra,* at 766 [64 S.Ct.].

We have also considered the point advanced by plaintiff that the practice of the defendant union in demanding full payment of so-called union dues from the Negro workers as a condition to their obtaining employment, without giving them in return the full benefits of union membership, is a violation of the federal ''kickback'' act. (40 U.S.C.A. § 276(b); see *United States* v. *Laudani*, 320 U.S. 543 [64 S.Ct. 315,

88 L.Ed. 300].) Since the judgment below may be affirmed on other sufficient grounds, we find it unnecessary to decide this question.

Defendant Marinship contends that it should not have been enjoined at all, urging that because of the National Labor Relations Act it is bound to enforce the closed shop agreement and may not look behind a notice from the union that a particular employee is not a member in good standing. Marinship, however, has full knowledge of the controversy between the union and the Negro employees, and its action in complying with the union's demands has at least indirectly assisted the union in carrying out its discrimination against plaintiff. As in any other case where a third person knowingly assists in the commission of a prohibited act, Marinship's conduct may be enjoined in order to make effective the injunction against Local No. 6, the principal defendant herein. Marinship is not, of course, to be subjected to any penalty for its enforcement of the closed shop agreement. The order does not require Marinship to interfere with the administration of internal affairs of the union, and ordinarily, in absence of judicial proceedings, it need not look behind the notice from the union that a particular employee is not a member in good standing. The employer is protected by the defense of operation of law in any union charge of violation of the closed shop agreement.

Equally unavailing is the contention of the union that the action should not proceed because it involves the validity of by-laws and other regulations of the International Brotherhood, which apparently has not been served with process and against which the injunction is not directed. The trial court, however, did not purport to annul any rules of the International Brotherhood,—it simply enjoined certain conduct by Local No. 6 and the other defendants who are within the jurisdiction. The fact that such conduct might have been committed in accordance with the regulations of an association that may be beyond the jurisdiction of the court cannot deprive the court of power to prevent the continuance of wrongful acts by those agents or affiliates that are within the jurisdiction. The effect of defendants' argument is that a person may escape liability for a wrongful act on the ground that he acted under direction of an absent principal. The true rule is, of course, that the agent is liable for

his own acts, regardless of whether the principal is liable or amenable to judicial action.

Defendants contend that a state court has no jurisdiction over a labor controversy in the shipbuilding industry and cannot enjoin enforcement of the closed shop agreement because, they say, shipbuilding affects interstate commerce and exclusive jurisdiction over labor disputes arising therein lies in the National Labor Relations Board. They urge that under the National Labor Relations Act the board is empowered to issue "cease and desist" orders and that the power is exclusive. Section 160(a) of 29 U.S.C.A. provides, in part: "The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (*listed in section 158*) affecting commerce. This power shall be exclusive. . . ." (Italics added.) Section 158, however, embraces only such unfair labor practices as are committed *by employers*. There is no reference to acts of employees or members of labor unions, and the board is not given jurisdiction to prevent such acts. (See 2 Teller, Labor Disputes and Collective Bargaining (1940) 695.) The dispute involved in this case is essentially between the members of a labor union and certain individual workers. The employer is made a party solely in order to render effective any order issued with respect to the union defendants, and there is no charge that the employer has committed an "unfair labor practice" within the meaning of section 158. The board is also given jurisdiction to certify the representatives of the employees selected for purposes of collective bargaining and to investigate any controversy with respect to who are the proper representatives (29 U.S.C.A., § 159), but it is not disputed in this case that Local No. 6 is the bargaining agent authorized by the employees to enter into collective agreements with Marinship.

The federal act does not deprive a state of power to prevent unlawful conduct by labor unions where, as here, such conduct is not authorized or protected by the act. In *Allen-Bradley Local No. 1111* v. *Wisconsin E. R. Board*, 315 U.S. 740 [62 S.Ct. 820, 86 L.Ed. 1154], it was held that a state could properly prevent mass picketing and picketing of employees' homes even though the employer involved was subject to the federal act, the court saying, at page 749: "Congress has not made such employee and union conduct as is involved in this case subject to regulation by the federal

Board," and, at page 750: "Congress designedly left open an area for state control." (See, also, *Christoffel* v. *Wisconsin Employment R. Board*, 243 Wis. 332 [10 N.W.2d 197], certiorari denied, 320 U.S. 776 [64 S.Ct. 90, 88 L.Ed. 466].)

■ There is no merit to defendants' contention that exercise of jurisdiction by a state court would violate the War Labor Disputes Act or invade the jurisdiction given thereby to the National War Labor Board. Section 1507(a)(1) of 50 U.S.C.A. [57 Stats. 166] provides that the War Labor Board may conduct a hearing whenever "the United States Conciliation Service . . . certifies that a labor dispute exists which may lead to substantial interference with the war effort. . . . If in the opinion of the Board a labor dispute has become so serious that it may lead to substantial interference with the war effort, the Board may take such action on its own motion." There is nothing in the record to show that either the Conciliation Service or the board has determined, that this controversy may lead to substantial interference with the war effort. Further, there is nothing in the War Labor Disputes Act which would prevent a state from enjoining wrongful conduct although such conduct might lead to interruption of the war effort, at least in cases over which the War Labor Board has not assumed jurisdiction.

■ Defendants contend that plaintiff has failed to exhaust an available administrative remedy provided by Executive Order No. 9346 of the President of the United States creating the Fair Employment Practice Committee and authorizing it to "receive and investigate complaints of discrimination forbidden by this Order . . . and take appropriate steps to obtain elimination of such discrimination." The remedy afforded by the Fair Employment Practice Committee, however, is not such a complete and adequate administrative remedy as is contemplated by the rule invoked. A recent bulletin issued by the committee entitled "FEPC: How it Operates" clearly sets forth the limited nature of its authority. (Reported in 14 L.R.R. 724, August 7, 1944.) The parties are entitled to no hearings, and hearings are held "only after the members of the Committee have agreed upon such action. . . . The Committee may request the party charged to present material, but it has no power to subpoena witnesses or records." It apparently has no direct means of enforcing its orders: "Should the Committee's directives be defied, such

violation can be referred to the proper contracting agency. . . . Ultimately noncompliance is certified to the President of the United States. The Committee can also bring such cases of noncompliance to the attention of the Chairman of the War Manpower Commission.'' Thus the committee is an advisory body created by an executive order under the wartime powers of the President, and it was not intended that this committee should supplant the ordinary remedies afforded by the courts.

 Defendants urge that Local No. 6 should not have been directly ordered to admit plaintiff as a member. In accordance with the principles discussed above, the union may not maintain *both* a closed shop and an arbitrarily closed or partially closed union. Negroes must be admitted to membership under the same terms and conditions applicable to non-Negroes unless the union and the employer refrain from enforcing the closed shop agreement against them. (See *Wilson* v. *Newspaper & Mail Deliverers' Union,* 123 N.J.Eq. 347 [197 A. 720], *supra.*) The order of the trial court, when read as a whole, may be interpreted as allowing this alternative. Under the circumstances of this case, it is unnecessary to determine whether or not the union, in absence of a closed shop agreement, would be required to open its doors to all qualified employees.

The injunction, contrary to defendants' contention, is not so broad as to give Negroes any greater right to membership than that extended to other persons; it was clearly intended to do no more than eliminate discrimination upon the basis of race and color alone.

There is no necessity to require plaintiff and the other Negroes to pay union dues into court to be impounded pending the outcome of the action.

The judgment is affirmed.

Shenk, J., Curtis, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.

Appellants' petitions for a rehearing were denied January 25, 1945.