**NATURAL RESOURCES, INC. and A. K. Wilson, Appellants,**

v.

**William J. WINEBERG, Appellee.**

**No. 19367.**

United States Court of Appeals
Ninth Circuit.

Aug. 2, 1965.

Rehearing Denied Sept. 8, 1965.

 

James C. Dezendorf, George L. Wagner, Koerner, Young, McColloch & Dezendorf, Portland, Or., for appellants.

Bruce W. Williams, Al J. Laue, Williams, Skopil & Miller, Salem, Or., for appellee.

Before O R R, B A R N E S and KOELSCH, Circuit Judges.

KOELSCH, Circuit Judge.

This suit was brought by William J. Wineberg against Natural Resources, Inc., A. K. Wilson, its president, (hereinafter referred to as "the defendants") and several others, to quiet title to real property situated in Humboldt County, California, and to recover dam-

ages for removing growing timber.[1] Both Wineberg and Resources claimed as vendees under grant deeds executed to them respectively by one O. O. Barker and wife.[2] The deed to Wineberg antedated those to Resources, but the defendants sought to overcome the effect of this fact by establishing:

1. That the deed to Wineberg, although purporting to be an absolute conveyance of the property was in reality a mortgage given to insure repayment of a loan to Barker, and (in the alternative)

2. That Resources was an innocent purchaser of the property from the Barkers.[3]

The district court found for Wineberg and against the defendants. This appeal is by the defendants from the judgment and the order of the court denying their motion for a new trial.

■ The defenses, being entirely factual, the trial court's main and subsidiary findings are conclusive on this appeal, unless we can fairly conclude they are "clearly erroneous" within the well known definition stated in United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). We are firmly convinced that they are not.

■ The evidence relating to the purported purchase, when carefully analyzed, clearly portrays an elaborately calculated scheme by Wineberg to "avoid" income tax liability by setting up the transaction to appear as a "like for like" trade within the permissive provisions of 26 U.S.C. § 1031.[4] The methods he employed to carry out the scheme remind us of the profound observation by the poet Scott in Marmion, Introduction to Canto VI, Stanza 17: "Oh, what a tangled web we weave, When first we practise to deceive![5] But, in spite of its complexities, the proof is ample that the deed to Wineberg was intended to be and was what it

---

1. Jurisdiction of the district court was rested upon diversity of citizenship of the opposing parties under 28 U.S.C. § 1332 (a) (1).

2. Such deeds carry with them covenants against prior conveyances or encumbrances by the grantor. Calif.Civ.Code § 1113; Snyder v. Pine Grove Lumber Co., 40 Cal. App.2d 660, 105 P.2d 369 (1940).

3. Under the law of the forum state this is an affirmative defense; the burden is on the defendant to prove he purchased the property and paid the purchase price before notice of the real owner's title. 50 Cal.Jur.2d, Vendor and Purchaser, §§ 377, 378 (1959).

4. So far as necessary to notice here, Section 1031(a) provides "Nonrecognition of gain or loss from exchanges solely in kind. No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held for productive use in trade or business or for investment."

5. The district judge, in a written opinion from which we quote, appraised the transaction and its background in these words: "The evidence shows that prior to May 22, 1948, the date on which Barker delivered the deed to Wineberg in Portland, Oregon, that Wineberg was negotiating with an Oregon firm, the Weinert Lumber Co., for the sale of some timber owned by Wineberg in Oregon. Wineberg's testimony indicated that, contemplating both the purchase of the California property from Barker, and also the sale of his Oregon timber to the Weinert Lumber Co., he wanted to unite both transactions into a like-for-like trade and thus avoid payment of taxes on the gain realized upon the sale of the Oregon timber. [At this point we interpolate the following explanation: It is clear that Wineberg intended to create this appearance by what would amount to a "three way deal": He would transfer his Oregon timber to Weinert. Weinert would then issue a check for $6,000.00. The check would be payable not to Wineberg but to Barker. Upon receipt of the check Barker would "sell" his California land to Weinert and the latter would then convey it on to Wineberg, thus seemingly making the transaction an exchange between Wineberg and Weinert]. Before this proposed transaction was consummated, however, Barker [being in im-

appeared to be—a conveyance in fee simple, and for a valuable consideration.

■ Although the deed to Wineberg was executed prior to the time Resources "purchased" the property, it was not recorded in the office of the County Recorder until after Resources had recorded its deeds from the Barkers. As a consequence the Wineberg deed, although valid as against the Barkers and those "who ha[d] notice thereof" [Cal.Civ. Code § 1217] was void if Resources was a subsequent purchaser "in good faith" within the meaning of Cal.Civ.Code § 1214.[6] Mayhew v. Burke, 206 Cal. 396, 274 P. 517 (Cal.1929).

■ Wineberg did not contend that Resources had actual knowledge of his earlier deed but rather that Resources had constructive notice of his ownership by reason of his possession.[7]

Since at least 1868, the California courts have held that:

" '[W]hen a purchaser has knowledge of any fact sufficient to put him on inquiry as to the existence of some right or title in conflict with that he is about to purchase, he is presumed to have made the inquiry and ascertained the extent of such prior right or to have been guilty of a degree of negligence equally fatal

mediate need of funds and apparently not being able to wait until the check from Weinert was available] came to Portland on May 22, 1948, delivered the deed granting the property from him directly to Wineberg, and received Wineberg's check for $6,000. It appears that Wineberg at that time wrote this notation on the check:

'In full, 880 acres, Humboldt Co. Calif.' However, lines have been drawn through this notation so as to partially obliterate it, and the superimposed word 'Loan' was written over it. Wineberg's check stub for this check has the word 'Loan' entered thereon, and his books show that on that day he made a loan to Barker of $6,000. Three days later, Wineberg executed a bill of sale to Weinert Lumber Co. for his Oregon timber, and this document recites that the timber is transferred to Weinert Lumber Co. in trade for timber located in California. Two days later, on May 27, 1948, this unusual transaction occurred: Barker returned to Portland, and Wineberg delivered to him a second check for $6,000 from Weinert Lumber Co. and naming Barker as payee. Weinert Lumber Co. treated its check to Barker, to whom it was a stranger, as payment to Wineberg for the Oregon timber he transferred to Weinert Lumber Co., and Wineberg entered the $6,000.00 check from Barker to him [i.e., Barker's own check which he made and gave to Wineberg immediately upon receipt of the Weinert check from Wineberg] as payment of the loan for the same amount he had made to Barker five days previously." Wineberg v. Moore, 194 F.Supp. 12, 13–14 (D.C.Cal.1961).

We are satisfied, as was the trial judge, that the above résumé reflects the truth of the matter. The appellant's

vigorous attack on the validity of the court's finding upon the issue of payment is premised primarily upon the fact that Wineberg's checkbook showed a balance of less than $6,000.00 when this check to Barker was written. They argue that this proves the bank did not honor the check. However, the check itself shows that it was presented to the bank and on it appears the bank's "paid" cancellation; there was no documentary or oral proof adduced to contradict this notation.

6. Section 1214.
 "Every conveyance of real property, other than a lease for a term not exceeding one year, is void as against any subsequent purchaser or mortgagee of the same property, or any part thereof, in good faith and for a valuable consideration, whose conveyance is first duly recorded * * *."

7. This succinct statement of the rule applicable here and the reason underlying it is set out in 19 Am.Jur. Estoppel, Section 118, page 775:
 " 'Where a party is found in possession of real property without any title of record, good faith and common prudence require a purchaser to inquire under what title he holds, and if he fails to so do, and purchases, he takes title subject to the equities of the parties in possession. But if the legal title and possession unite in the same person, there is no necessity for inquiry, as the purchaser may well presume the possession to be based on the legal title.' Generally speaking, a person in possession of land is not held to be guilty of laches or negligent delay of such a nature as to estop him to assert his rights, as against successors of one who had a title of record.' "

**690**

to his claim to be considered as a bona fide purchaser.' "

Pell v. McElroy, 36 Cal. 268, 277 (1868). See also, Davis v. Baugh, 59 Cal. 568 (1881) and cases in footnote 19 of 50 Cal.Jur.2d § 369, p. 471. Nor will a purchaser be heard to deny his duty to make a reasonable on-site inspection of the property to ascertain facts leading to inquiry. Pell v. McElroy, supra, 36 Cal. at 271. Thus "[i]t is * * * well settled that where a person who is a stranger to the record title of the vendor is in possession, the purchaser is under a duty to make inquiry of such stranger's rights, and failure to do so deprives him of the status of bona fide purchaser." Manig v. Bachman, 127 Cal.App.2d 216, 273 P.2d 596, 600 (1954).

> " 'Possession is notice not only of whatever title the occupant has but also of whatever right he may have in the property, *and the knowledge chargeable to a person after he is put on inquiry by possession of land is not limited to such knowledge as would be gained by examination of the public records.*' "

Pacific Gas & Electric Co. v. Minnette, 115 Cal.App.2d 698, 252 P.2d 642, 646 (1953). In short, possession requires a reasonably diligent inquiry into the nature of the right asserted by one in possession and charges the purchaser with knowledge of whatever facts such an inquiry would reveal.

 The ultimate question of fact for the district court as fact finder was therefore whether Wineberg's possession of the property was such as to impart notice of his interest to Resources. On this issue too we are satisfied with that court's finding in favor of Wineberg.

The property consisted of an 880 acre tract of timberland situated in a remote section of northern California. Aside from fences, the improvements consisted of a house and several sheds near the south boundary of the property. The principal, if not the only access, was by a road extending from the main highway several miles distant through adjoining privately owned land and ending at a gate near the above mentioned buildings.

 There was considerable evidence to the effect that during all times when Resources was negotiating with the Barkers the property was posted with a number of printed signs. These signs, one of which was admitted into evidence as an exhibit, set forth in large printed letters the name and address of Wineberg, together with a "no trespass" warning. Some of the signs were prominently posted along the road and at the gate leading to the property; others were nailed to the house and a nearby tree; still others appeared at points along the river and near the hunting trails leading through the property.

Such signs clearly constitute a recognized means of asserting a possessory claim to property. Kunze v. Rosenzweig, 186 App.Div. 866, 174 N.Y.S. 664 (App. Div. 1919); Hatch v. Bigelow, 39 Ill. 546 (1864); see also, Nolan v. Grant, 51 Iowa 519, 1 N.W. 709 (1879). Resources would surely have seen one or some of them if it had conducted a reasonable examination of the premises.

 Whether Wineberg was estopped because of the delay in recording his deed, to assert title against Resources, likewise involved the issues of Wineberg's possession and Resources' constructive notice.

> "It has been the rule in [California] since the case of Boggs v. Merced Mining Co., 14 Cal. 279, that in order to bring about an estoppel against assertion of ownership of real property, four conditions against the owner of real property are necessary:
> 1. that the party to be estopped was apprised of the true state of his own title;
> 2. that he made the omission with intent to deceive or with such culpable negligence as to amount to constructive fraud;
> 3. that the other party was not only destitute of knowledge of the

state of the title, but also of the means of acquiring knowledge; and

4. that he relied on the admission to his damage."

Taliaferro v. Colasso, 139 Cal.App.2d 903, 294 P.2d 774, 778 (1956).

■ The district court's supported determination of the notice issue, adverse to Resources, is fatal to its claim based upon an estoppel.

■ The defendant Wilson additionally attacks the validity of the judgment so far as it makes him jointly liable with Resources for the value of all timber removed from the property by Resources and its vendees. He points out that he, in directing the logging operations and making sales, did not act for himself but rather acted for Resources, in the honest belief that Resources was the owner.

Section 2343 of the California Civil Code recognizes the common law that,

"One who assumes to act as an agent is responsible to third persons as a principal for his acts in the course of his agency, in any of the following cases, and in no others:

1. * * *

2. * * *

3. When his acts are wrongful in nature."

James v. Marinship Corporation, 25 Cal. 2d 721, 155 P.2d 329, 341 (1944). That rule is applicable here. The particular acts, constituting as they did the exercise of dominion over the property, were not authorized by the true owner. They were wrongful even though Wilson committed them in the honest belief that Resources was owner. Restatement, Torts § 164 (1934); 1 Mechem, Agency § 1456 (2d ed. 1914). The contractual relationship between Wilson and Resources made no difference. Restatement, Agency 2d, §§ 343–344 (1958). It is elementary that a person is personally responsible for his own torts.

Defendant's motion for new trial was based upon several grounds:

(A) Newly discovered evidence.

At the trial Wineberg testified that he purchased the property outright from the Barkers and denied that their deed to him was given as security for a loan. In support of their motion, defendants submitted the affidavit of one Elwood G. Buffum, wherein the affiant stated that he was present at a conference with Wineberg and his lawyer preparatory to trial; that Wineberg there stated he had taken the deed as security and that, after Barker failed to repay the loan he, Wineberg, elected to treat the instrument as a conveyance and recorded it as such.

■ Defendants were not entitled to a new trial as of right: the decision, whether to grant or deny them one was a matter within the discretion of the district court. True, Buffum's statements, bearing as they do directly upon the central issue in the case, would go beyond mere impeachment, but in view of the considerable evidence in the record, evidence touching upon this same subject, the court was acting well within that discretion in rejecting the motion on this ground. Bateman v. Donovan, 131 F.2d 759 (9th Cir. 1943).

(B) Misconduct of the trial judge.

The basis for this charge appears in a further affidavit of Buffum. He states that, during a recess in the trial, he went to the horse races with Wineberg's lawyer and several other men. That there, Wineberg's attorney noticed and pointed out to him the trial judge and Wineberg; that the two were seated together and engaged in conversation and that this continued for the balance of the afternoon.

■ We fully recognize the gravity of this indictment and the delicate task we face in its resolution. A judge, like Caesar's wife, must not only be free of any actual wrongdoing, but his conduct whether in or out of the courtroom must be above suspicion. Canon 33 of the Canons of Judicial Ethics bears constant repetition.

"[A judge] should * * * in pending or prospective litigation before him be particularly careful to

avoid such action as may reasonably tend to awaken the suspicion that his social or business relations or friendships constitute an element in influencing his judicial conduct."

If Buffum's statements were uncontradicted, we would be inclined to order a new trial. However, Wineberg's attorney filed a counteraffidavit, in which he categorically denied each charge. He flatly declared that he never attended any race at any place or at any time with Buffum; with equal vigor he affirmatively asserted that on occasion he went to a race with Wineberg at which he observed the trial judge "at a distance" but that neither he nor Wineberg sat with or talked to him.[9]

In this state of the record and, after much careful consideration, we think that the balance must be struck in favor of the trial judge.

(C) The final ground of defendant's motion is difficult to catalogue, but it reveals a shocking situation:

The district judge's failure to render a decision upon the issue of Wineberg's title—the central issue which was segregated and tried first—for more than four years after that matter was heard and submitted.

Some cases, of course, require more time than others to decide. But this was clearly not one of them. The law was relatively simple; the trial was not protracted, and the decision should have been announced promptly. Courts must act with diligence to dispose of pending litigation, if they are to merit public confidence and overcome the age old stigma cast upon them by "the law's de-

lay."[10] The lack of diligence here presented is indeed regrettable.

Defendants of course are not able to point to any actual prejudice because of the district judge's inexcusable inattention to this matter, but they urge the delay is "inherently prejudicial." The argument has considerable surface plausibility, for the fact cannot be denied that memory tends to dim, recollection to grow faint, and impressions to vanish, with the passage of time.

 Because this assignment calls into question the integrity of the district court, we have considered the assignment as a matter coming under our primary supervisory jurisdiction, rather than simply as a ruling of a trial court governed by the "abuse of discretion" limitation upon review. And, in that capacity, we have made a critical survey of the whole record, including a painstaking analysis of the entire reporter's transcript. This study reveals that the trial was conducted with extreme fairness to defendants—indeed, they make no complaint of any trial error by the district court—and that there was little real conflict in the evidence. It further shows that the findings on material issues are supported in most particulars by the testimony of disinterested witnesses and not solely upon self-serving statements of Wineberg. While we are not prepared to say that under no circumstances would undue delay be unavailable as a ground for new trial, we are satisfied that such a drastic measure is not warranted here.

No reversible error appearing, the judgment is affirmed.

9. On new trial Wineberg would probably have to secure other or additional counsel if he wished to adduce these statements as testimony, for Canon 19 of the Canons of Professional Ethics contain the admonition that lawyers must leave the trial of cases to other counsel whenever they are called to give other than formal testimony.

10. Counsel frankly state that they have been unable to discover any cases involv-

ing the precise point under consideration. They acknowledge that none of the cases they cite [Markakis v. Liberian S/S The Mparmpa Christos, 161 F.Supp. 487 (D. C.N.Y.1958); Quintin v. Sprague Steamship Co., 252 F.2d 812 (2d Cir. 1958); Hellenic Lines v. The Exmouth, 253 F.2d 473 (2d Cir. 1958)] do any more than criticize judicial dilatoriness. Our own research has only produced additional cases to that same effect.