Philipos MARKAKIS, Libelant,

v.

LIBERIAN S/S THE MPARMPA CHRIS-
TOS her engines, etc., G. Lemos, a non-
resident, individually and as Master, and
C. Pateras, a non-resident, individual-
ly and as Master, and G. C. Lemos, Jo-
seph Scovell, Ernest A. Peters, and
Nicholas Lyras, all non-residents, and
Seguridad Compania Naviera, S.A.,
Boyd, Weir and Sewell, Inc., Eagle
Ocean Transport, Inc., and G. Lemos
Bros. Co., Limited, all foreign corpora-
tions or associations, as owners and/or
operators of the Liberian S/S Mparmpa
Christos, Respondent-Claimant.

United States District Court
S. D. New York.

March 27, 1958.

488

Standard, Weisberg, Harolds & Malament, New York City, Louis R. Harolds, New York City, of counsel, for libelant.

Zock, Petrie, Sheneman & Reid, New York City, Edwin K. Reid, New York City, of counsel, for respondent-claimant.

HERLANDS, District Judge.

The Court of Appeals for this circuit has urged trial judges in non-jury cases to render a decision as soon as practicable after the conclusion of the trial. Hecht, Levis & Kahn, Inc. v. The President Buchanan, 2 Cir., 1956, 236 F.2d 627, 629; Mazella Blasting Mat Co. v. Vitiello, 2 Cir., 1957, 250 F.2d 935. See dissenting opinions of Chief Judge Clark in Hellenic Lines, Ltd. v. S. S. Exmouth, 2 Cir., 253 F.2d 473, and Quintin v. Sprague Steamship Company, 2 Cir., 252 F.2d 812, note 2. The rationale of this view is practical; a prompt decision—while memory retains its vividness and clarity—more precisely reflects the trial judge's evaluation of the witnesses' relative credibility and his appraisal of evidentiary details.

In this 20-day trial of a personal injury action in admiralty, the record consists of 2,997 pages of testimony, 41 libelant's exhibits in evidence and 34 respondents' exhibits in evidence. In order to render a decision as soon after the conclusion of the trial as is possible, the Court will, of necessity, combine separately numbered findings of fact and conclusions of law with its opinion. All essential findings and conclusions, most of which are numbered, are encompassed within this opinion. The propriety of that procedure in an admiralty action has been adjudicated. Hecht, Levis & Kahn, Inc., v. The President Buchanan, 2 Cir., 1956, 236 F.2d 627, 629.

The libelant, Philipos Markakis, is a 33-year old Greek seaman. There is no dispute about the fact that he was hurt in an accident that occurred on February 19, 1956, aboard a motor vessel, the S/S Mparmpa Christos. That vessel is the respondent in rem. It was and is owned, operated, managed and controlled by Seguridad Compania Naviera, S.A., the respondent-claimant. The latter has appeared in personam.

The respondent-vessel is documented and registered under the laws of the Republic of Liberia, whose flag she flies. The respondent-owner of the vessel, Seguridad Compania Naviera, S.A., is a Panamanian corporation.

The libelant was engaged by the respondents at Piraeus, Greece, on January 12, 1956 (s. m. pp. 963, 965, 1797; Exhs. F and G) to serve as an able-bodied seaman. Pursuant to that engagement (s. m. pp. 91, 962) libelant proceeded from Piraeus to Kiel, Germany, where (on January 20, 1956) he signed articles of agreement (s. m. pp. 92, 963, 966, 973, 985, 987, 988, 996, 1797) and entered into the performance of his duties.

The accident took place within the navigable waters of the United States and the State of Virginia while the vessel was lying at Hampton Roads, Virginia. The vessel had loaded a cargo at Norfolk, Virginia (s. m. p. 93), to be shipped to Germany. She was engaged in securing herself for sea.

No question of jurisdiction has been raised. The Court has not been called upon to exercise its discretion in assuming or rejecting jurisdiction.

The parties are in fundamental disagreement as to which nation's or state's law is applicable—Liberian, Panamanian, non-statutory general maritime American, statutory American or Virginia state law. With respect to the Liberian law itself, the parties differ with respect to its interpretation.

This question of the choice of applicable law has been complicated by what libelant suggests is "a riddle wrapped in a mystery inside an enigma." An element of libelant's argument is that the the Court may properly choose statutory American law (specifically, the Jones Act) because confusion has been contrived by the principals behind the respondents in order to mask their identity and citizenship; and that the Court should pierce the corporate veil, disregard the corporate entities, and find that the beneficial interest in the respondents has been in citizens and corporations of the United States or of some of the states of the United States. The confusion arises out of a network of circumstances alleged by libelant: the respondent-vessel, registered in Liberia, flies the Liberian flag only as a "flag of convenience"; the respondent-owner is only a paper Panamanian corporation and it owns the vessel only nominally; certain persons interested in this Panamanian corporation are Greek nationals; these Greek persons operate the vessel by means of instructions issued from London through the medium of an English corporation, this English corporation, in turn, utilizes various American corporations as its agents to obtain charters for the vessel, husband it, handle its crew's wages and claims, and generally to execute the orders emanating from London; and that the vessel's major contacts are American.

In addition to the question of the applicable substantive law, the evidence has raised other basic issues: what was the actual cause of the accident and how did it happen; was the accident the competent producing and proximate cause of the libelant's injuries; and what was and is the nature and extent of libelant's injuries and damages considered from the points of view of medicine and law?

In resolving all of the foregoing and related issues, the Court has made the factual findings and reached the legal conclusions set forth in this opinion.

The libelant has firmly established the findings in his favor by the clear preponderance of the credible evidence. In so finding, the Court is acting upon "the definite and firm conviction" that such are the facts, and not merely because "there is evidence to support" such findings. Cf. United States v. United States Gypsum Co., 1948, 333 U.S. 364, 869, 68 S.Ct. 525, 788, 92 L.Ed. 746, 1147.

Aside from the question of the choice of law the crux of the case is the relative credibility of the witnesses. The Court has been required to decide which of divergent inferences the Court will draw from the testimony and documentary proof. The controlling evidence, for the most part presented in open court, is sharply conflicting.

Mindful of its fact-finding responsibility in this non-jury case, the Court has evaluated the reliability of the witnesses in terms of the inherent persuasiveness of their testimony and their relative credibility. In making such appraisal, the Court has closely considered the demeanor of the witnesses on the stand, their manner of testifying, their frankness or lack of candor, their partisanship or impartiality, and the testimonial effect of any motive or bias.

The Court has critically evaluated the credibility of libelant himself, who tes-

tified at great length during parts of nine days of the trial (January 6, 7, 9, 10, 13, 14, 16, 17; February 25). In appraising his credibility, the Court has studied those portions of his pretrial depositions that have been put into the record by respondents and supplemented by contextual excerpts introduced by libelant. The Court finds no substantial or material prior inconsistent or contradictory statements. The essence of libelant's story from the very beginning has been the same.

On all occasions libelant testified through a Greek interpreter. Translation is an inexact art and science. Nomad, The Way of the Translator, The American Mercury (1945) vol. 60, p. 330. When questions are put and answered through an interpreter, some imprecision in paraphrase and idiom is unavoidable. This observation also applies in part to the various medical reports and hospital records because unidentified interpreters of undefined skill were used on occasions to interview and communicate with the libelant.

The structural facts and the architecture of libelant's pretrial and trial testimony reveal his basic veracity. The Court does not imply that libelant's testimony and conduct have been entirely free from a degree of exaggeration about his past and present physical and mental condition. Respondents' psychiatric expert was of the opinion (s. m. pp. 2266, 2307, 2390–2391) that the libelant has now substantially recovered and that, consciously or unconsciously, he is play-acting the role of a mental and physical cripple. The Court rejects that opinion. Libelant's larmoyant tale is based on hard fact, not malingery (s. m. pp. 1323–1324, 1621–1629, 1669–1670, 1697–1698, 2335–2336, 2381–2383, 2387–2389, 2417).

In the case of libelant's testimony, as in the case of all of the other witnesses' testimony, the Court has selected and accepted those portions of the testimony that have impressed the Court as truthful, and has rejected those portions that have impressed the Court as being intentionally or unintentionally incorrect or false. There has been neither wholesale acceptance nor wholesale rejection of any one witness's testimony. The real facts have been sifted out of a welter of conflicting and sometimes unclear evidence.

As fact-finder, the Court has selected from the entire record those logical inferences which accord with common sense and experience and which fall within the normal range of probabilities in the context of the totality of the evidence.

The standard of libelant's burden of proof in this case—" 'by a preponderance'—means that the inferences from the testimony are such as to persuade that the occurrence of an essential fact was *more likely or probable* than its non-occurrence." Judge Frank, concurring, in United States v. Masiello, 2 Cir., 1956, 235 F.2d 279, 286. (Emphasis in original.)

## Findings of Fact

1. At all pertinent times, respondent S/S Mparmpa Christos was a merchant vessel registered under the laws of the Republic of Liberia and flying the Liberian flag.

2. At all pertinent times, respondent Seguridad Compania Naviera, S.A., was a corporation organized and existing under the laws of the Republic of Panama.

3. At all pertinent times, respondent Seguridad Compania Naviera, S.A., was the owner of record of respondent S/S Mparmpa Christos, and directly or through others, operated and controlled the said vessel.

4. At all pertinent times, the respondents were engaged in foreign commerce between the United States and other countries, through charter arrangements.

5. Respondent corporation (up to February 19, 1956, the date of the accident) did not directly issue orders or instructions with reference to the operation and control of the vessel. Said corporation did not maintain (up to and at the time of the accident) an office in the Republic of Liberia. Operating in-

structions did not come from the Republic of Liberia or the Republic of Panama. Up to and at the time of the accident, the vessel had not traveled between Liberia and other ports nor between Panama and other ports.

At the time of the accident, the vessel was making her maiden voyage (s. m. pp. 1964, 2111). She had been built in Japan and delivered to the respondent-owner in November 1955. She took on her crew in Germany, traveled light to Norfolk, Virginia, where she loaded a cargo of coal destined to Germany.

6. (a) Eagle Ocean Transport, Inc., a Delaware corporation with offices at 24 State Street, Manhattan, New York, shared offices with G. Lemos Brothers Corp., a New York corporation, whose name was on the door with Eagle Ocean Transport, Inc.

(b) Eagle Ocean Transport, Inc., acted on behalf of the respondents, pursuant to instructions from G. Lemos Bros. Ltd. of London.

(c) G. Lemos Bros. Ltd. of London was controlled by the same Greek family which controlled G. Lemos Brothers Corp. of New York.

(d) Joseph Scovall, an American citizen residing in New York, became secretary of Seguridad Compania Naviera, S.A., by instructions received from G. Lemos Bros. Ltd. of London. He also was secretary of Eagle Ocean Transport, Inc., which handled local matters for various foreign flag vessels of G. Lemos Bros. Ltd. of London when in the New York area.

(e) Said G. Lemos Bros. Ltd. of London operated various foreign flag vessels under Honduran, Panamanian and Liberian flags, and through various foreign corporations.

(f) The Lemos family referred to herein were Greek citizens.

(g) Boyd, Weir & Sewell, Inc., an American corporation with offices at 24 State Street, Manhattan, New York, handled wage accounts for the crew of the vessel and undertook to obtain char-

ters for it and to collect the freight hire on behalf of the shipowner.

(h) At the time of the accident herein an American firm, Hasler & Co., was the vessel's husbanding agent in Norfolk, and the bill of lading (Exhibit JJ) shows that C. H. Sprague & Son Co. of Boston was shipping a cargo of coal on the vessel from Norfolk to Germany.

(i) The beneficial interests in the respondents have been in citizens and corporations other than citizens and corporations of the United States or of any of the forty-eight states of the United States.

7. At the time of libelant's accident, as well as when process was served herein, respondent-vessel was located in navigable waters in Hampton Roads, Virginia; and within the territorial waters of the United States of America.

8. At all pertinent times, libelant was in respondents' employ as an able-bodied seaman on said vessel.

9. Libelant is a citizen of Greece. He has resided in the United States since February 19, 1956, the date of the accident. At the time of the filing of the libel herein and during the time of all the medical treatment which libelant has received he has been and still continues to be in the United States.

10. This suit was commenced on September 28, 1956, in the United States District Court, District of Virginia, Newport News Division, by process *in rem* and *in personam*, in admiralty, while the vessel was at that port.

11. On October 2, 1956, process of the United States District Court for the District of Virginia, dated October 2, 1956, was returned to the Court, with the following notation and admission on the reverse side thereof:

"Seguridad Compania Naviera S.A., acting by and through its proctor, hereby makes a general appearance and accepts service with the same force and effect as if actually

served by the U. S. Marshal. This 5th day of October 1956.

"(S) Seguridad Compania
Naviera S. A.
By Charles R. Dalton, Jr.
of Proctors"

12. Jurisdiction was obtained over the respondent-vessel and the respondent-owner *in rem* and *in personam*. Upon the trial herein, counsel for the respondents stated, formerly, that such jurisdiction of the Court was admitted (s. m. p. 3).

13. On February 19, 1956, at about 3 P.M., while the libelant was assisting in securing the vessel for sea, after the vessel had loaded a cargo of coal, the operating reel wire was cut and severed. This caused the No. 2 port boom to fall and to give the libelant a glancing blow on the head, neck, left shoulder and back. This boom is a hollow steel tube, about 40 feet long, weighing 2,000 pounds, and capable of lifting five tons of cargo. In securing for sea it was customary to lower the cargo boom from the vertical to the horizontal position in order to secure the boom head on a boom cradle.

14. At the time of the accident, libelant was working in the vicinity of the No. 2 hatch. The reel operating wire led from the port reel to a gypsyhead on the port winch, and was part of the equipment located on the deck used for raising and lowering the boom. This reel operating wire became caught or entangled in the brake gear teeth of the reel, when the winch (powered by electricity) was suddenly put into operation by other seamen. The reel operating wire was cut and severed, thereby causing the No. 2 port boom to fall and the boom's gooseneck to jump out of the boom step bracket. The lower portion of the falling boom struck the libelant and rendered him unconscious. He was unconscious for ten to thirty minutes (Exhibit U; s. m. pp. 147, 238; 11, 13, 14, 19–21).

15. The exhibits, as amplified by the testimony, establish the following facts:

(a) Exhibit 1 shows the reel, which has been referred to synonymously as the "wire drum" or "the topping lift drum." This is the unit behind the metal surface designated as "R" on Exhibit 1. The wire on the reel actually consists of two separate wires of two different thicknesses, separated on the drum of the reel by a solid disk-like metal structure called a separator (marked "WW" on Exh. 2).

The thicker wire on the reel (which wire is to the right of the separator, indicated on Exhibit 2) is known as the topping lift wire or the topping wire; and it leads vertically (see "D" on Exhibit 1) to a block at the top or head of the mast (King or Samson post), thence to the head of the No. 2 port cargo boom. As the topping lift wire is paid off the reel, the boom is lowered to the deck through the principle of gravity.

The thinner wire on the reel (which wire is to the left of the separator, indicated on Exhibit 2) is known as the reel operating wire. It is five-eighths of an inch in diameter. It is illustrated, in coiled form, on Exhibit 1 by the wire from the loop "E," running through points "W" and "E" and thence onto the reel-drum. It is also illustrated by the wire on the extreme left side of Exhibit 2.

The function of the reel operating wire is to operate the reel by means of power transmitted from the gypsyhead of the winch to the reel by means of the reel operating wire.

(b) The winch is outlined in red on Exhibit LL; the reel is outlined in blue on Exhibit LL. These two pieces of equipment are on the port side of the vessel; and hence have been referred to respectively as the port winch and port reel. They are in the vicinity of the No. 2 cargo hatch (see Exhibit LL), which is in the general area designated as "A" on Exhibit 1. The winch above referred to has been identified in this case as "the forward port electric winch at the No. 2 hold."

This winch is photographed in Exhibit 1. At its extreme left (outboard side) is

a structure known as the gypsyhead, parts of which have been designated on Exhibit 1 by the letters "G", and "Ⓧ". "G" is an opening, through which a loop or ring ("E") of the reel operating wire is placed. "Ⓒ" is the outer rim of the lip of the gypsyhead. To the right of the lip is the drum of the gypsyhead.

To the right of the gypsyhead itself is a metal structure housing part of the winch operating mechanism. To the right of this mechanism is the drum of the winch, on which is wound a wire that runs to the boom heel block (see Exhibit 21); this latter wire is the cargo hoist leadline or hauling part, and is also called the cargo runner (see Exhibit 21·).

(c) The boom involved in this case has been described and identified as "the forward port cargo boom at the No. 2 hatch."

The boom is attached at its lower end or heel to the mast (a Samson or King post) by a bracket or device known as a boom step or boom step bracket (see Exhibit 21), indicated on Exhibit 1 by the letter "B" and by the red oval on Exhibit 3. The extreme end or tapered portion of the boom heel is indicated by the letter "C" on Exhibit 1 and by the letter "G" on Exhibit 3. This extreme end of the boom heel is called the gooseneck.

(d) The gooseneck is held or positioned inside the boom step (boom step bracket) by a pin called the gooseneck pin, also called the boom heel pin (see Exhibit 21), and indicated by the parallel broken red lines on Exhibit 3. The function of a gooseneck pin (boom heel pin), properly and suitably designed and constructed in accordance with customary, approved maritime practices, is to hold the gooseneck inside the boom step bracket in order to prevent the gooseneck and gooseneck pin from jumping up and down and from jumping out of the boom step bracket and, at the same time, to permit the gooseneck and the gooseneck pin to turn or pivot laterally inside the boom step bracket.

(e) While there are permissible variations in the construction of a gooseneck pin (e. g., Exhibits 5 and 20) and, as a matter of law, a vessel need not be equipped with the latest or the best equipment, nevertheless, a gooseneck pin that is suitably designed and constructed to serve its intended use and purpose should be so designed and constructed as to firmly secure the gooseneck pin (and thereby the gooseneck) in the boom step bracket.

(f) [I] In the present case, the gooseneck pin was not so designed and constructed. The gooseneck pin and its appurtenances were, at the time of the accident herein, unseaworthy pieces of equipment. They were not designed and constructed in accordance with accepted principles and practices of naval architecture, shipbuilding and the maritime industry.

[II] The gooseneck pin and its appurtenances also failed to meet the standard of due care, in that a reasonably prudent shipowner and ship, under the same and similar circumstances, would have and should have seen to it that the gooseneck pin and appurtenances were adequately and reasonably secure, which they were not.

[III] The immediately preceding findings are based upon a careful analysis of the total record of testimony and exhibits. In particular, the Court accepts as reliable the expert opinion testimony given in behalf of libelant by Robert B. Zubaly (s. m. pp. 172–180, 203, 217–218, 234) and Antonio G. Pista (s. m. pp. 721–732, 757). The Court substantially discounts the expert opinion testimony given in behalf of respondents on this point (s. m. pp. 797, 820–821).

(g) Exhibit LL shows the relative positions of the winch and the reel. But that exhibit, for purposes of this case and for the critically precise detail involved herein, does not show clearly the fact (found by the Court) that the gypsyhead of the winch and the reel were not suitably and properly aligned with respect to each other. There was an absence of a fair or straight lead for the wire leading to the gypsyhead. To understand the practical and unfortunate

consequences of this improper off-center alignment, it is now necessary to consider the construction of the reel.

(h) The reel has an indented or toothed brake gear, pictured on Exhibit 2, one of the teeth being identified thereon by the letter "T." There are a number of such teeth. This contrivance functions together with a horizontal movable bar ("Z" on Exhibit 2) on the principle of a ratchet and pawl. Since these metallic teeth are firmly affixed to the drum of the reel, they revolve simultaneously when the reel revolves.

(i) As the reel revolves, the reel operating wire either reels on or pays out, depending on the direction in which the reel is turning. At the time of the accident there was no safety appliance, guard, flange or structure on the casing of the reel (or elsewhere) that would serve or served to prevent the reel operating wire from becoming caught, entangled or ensnarled in the moving gear teeth of the reel. The reasonably forseeable danger of such a happening was made all the more imminent by virtue of the fact here existing that due to the improper off-center alignment of the reel and the winch, the reel operating wire would not reel on or pay out from the reel on a straight line that was perpendicular to the axis of the drum of the reel; i. e., there was absent a fair or straight lead. The reel operating wire came on or off the reel at an angle that (measured from the axis of the reel drum) ran outboard; and, moreover, the wire itself would not be and was not taut at the very beginning when the winch and reel were put into motion. Furthermore, as the reel operating wire reeled on or paid out from the moving reel and gypsyhead of the winch, the wire would move sidewise or transversely from right to left and from left to right. This side motion was also a causal factor in the entangling of the wire on the rotating gear teeth. Hence, it was reasonably foreseeable that—and as here happened—the reel operating wire would be caught in the moving brake gear teeth and would be cut and completely severed.

(j) [I] The evidence patently establishes that the winch, reel and related appurtenances were not fit and suitable for the purposes for which they were intended to be used. They were not designed, constructed, positioned and maintained in accordance with customary, approved maritime practices. They were unseaworthy equipment; and the vessel was unseaworthy in that respect.

[II] In designing, constructing, positioning and maintaining or retaining such equipment, the shipowner was guilty of negligence, in that a reasonably prudent shipowner under the same or similar conditions would not have had designed, constructed, positioned and maintained or retained such equipment.

[III] The immediately preceding findings are based upon a careful analysis of the total record of testimony and exhibits. In particular, the Court accepts as reliable the expert opinion testimony given in behalf of libelant (s. m. pp. 167, 199–200, 732–756). The Court substantially discounts the expert opinion testimony given in behalf of respondents on this point (s. m. pp. 803ff, 820–821).

Thus, both unseaworthiness and negligence have been amply established by the clearly preponderant weight of the credible evidence.

16. Libelant's injuries were proximately caused by the negligence and the unseaworthiness of the respondent-vessel and the respondent-owner's fault in respect to such negligence and unseaworthiness.

17. According to the vessel's Chief Officer's deck log (Exh. 23), the accident occurred about 4:20 P.M., February 19, 1956. The deck log entries read as follows, in part:

"At this hour and while crew was working on battening down the holds, the port boom of No. 2 Hold fell down. By reason of falling, it injured the head and left shoulder of A.B. Philip Markakis. We moved him to the hospital of the ship and there gave him first aid. The in-

jured seaman complained of severe pains, therefore, we called the doctor through the Pilot Boat and doctor boarded the vessel. Upon doctor's recommendation, injured seaman was transferred by the tug boat, accompanied by doctor, to Marine Hospital for further treatment. * * * "

The foregoing facts are so found.

The company doctor referred to was Dr. Thomas M. Vorbrinck of Norfolk, Virginia. He is now deceased. At the time in question he was a general practitioner employed by respondents' Norfolk agent, Hasler & Co., not only in this matter but generally to render similar medical services with respect to sick or injured seamen employed on this vessel and other vessels of the same owner or syndicate or in behalf of the same underwriting group interested therein. He examined libelant at 6:30 P.M., about two and one-half hours after the accident. His combination report and bill dated February 21, 1956, recites that on February 19, 1956, libelant "was injured when boom line or wire broke and struck him on the back of his head, left shoulder and back. He had a head injury and probably a broken scapula or ribs. * * * " (Exh. N.) In his report dated October 10, 1956 (Exh. N), Dr. Vorbrinck said in part: "He had a small blunt cut or bruise on back of head and contusions of the neck, left shoulder and upper back. There was no evidence of cerebral concussion at the time of my visit. * * * The patient was able to travel with me on the launch to shore. * * * [He] was not in shock; however, he complained much of pain and discomfort."

18. Libelant remained as an in-patient at the United States Public Health Service Marine Hospital in Norfolk, Virginia, for about 33 days, from February 19, 1956, until March 23, 1956.

Under date of February 19, 1956 (when he was admitted), the Norfolk Hospital record (Exh. 10, p. 28) noted the following: "Cerebral concussion. R.O. [rule out] fracture. Contusion to neck. Left scapula,—R.O.—fx [fracture] cervical vertebra and left shoulder (scapula)."

When libelant was discharged from said hospital on March 23, 1956 the hospital record (Exh. 10, p. 1) noted: "Concussion of brain. Multiple contusions, head, neck and left shoulder, severe"; (and at pp. 29–30) "Maximum hospital benefits. Still complains of some headache but no objective sign. Discharge today. FFD [fit for duty]—2 weeks."

19. Upon his hospital discharge on March 23, 1956, libelant (accompanied by some representative of Hasler & Co.) went to the Immigration authorities at Norfolk. (s.m. pp. 345–346, 998, 999, 1858.) While there, libelant complained that he was unable to walk, felt dizzy, and that his heart was bothering him (Exh. T). Libelant was sent to New York, where he visited another of the respondents' agents, Eagle Ocean Transport, Inc.

20. During the period from March 23, 1956, to May 25, 1956, libelant received the following sums from the respondents:

(a) On March 23, 1956, in Norfolk from Hasler & Company $40 for "wages due," bus ticket to New York ($9.35) (Exh. 11);

(b) On April 2, 1956, in New York from Boyd, Weir & Sewell, Inc., another agent of respondents, $50 "to apply against unearned wages" (Exh. 12);

(c) On April 12, 1956, in New York from Boyd, Weir & Sewell, Inc., $40 "to apply against unearned wages" (Exh. 13);

(d) On May 25, 1956, in New York from Boyd, Weir & Sewell, Inc., $50 "on account of Maintenance and Cure" (Exh. S).

21. On March 1, 1956, while libelant was still in Norfolk Marine Hospital, an attorney commenced an action in the New York State Supreme Court in behalf of libelant, as plaintiff, against the respondent-claimant herein (Exh. C). On the same day, Eagle Ocean Transport,

Inc., advised (Exh. Z) the underwriters (Theodore F. Turner) to "take such steps as may be necessary to protect our interests," and enclosed the summons.

22. On March 30, 1956, Eagle requested Hasler to forward a preliminary medical report on the case "as soon as possible" (Exh. X). A similar request was repeated on April 12, 1956 (Exh. W).

23. Meanwhile, and on March 28, 1956 (Exh. O), a company doctor, Dr. Louis S. Ferris, examined libelant. Under date of April 11, 1956 (Exh. 33), Dr. Ferris wrote, in part: "He [libelant] now receives treatment as an out-patient. He is not able to go back to work but further treatment for several weeks at least is indicated."

24. In fact, libelant was not receiving out-patient treatment either from Dr. Ferris or anyone else (Exh. 32).

The writing referred to (Exh. 33) was submitted to the Immigration authorities, together with a letter from Eagle (Exh. R), in order to obtain an extension of libelant's deportation date. The later fact has significance, for the Court finds that the respondents did not attempt to ship the libelant out of the United States in order to foreclose or preclude the proper prosecution of his claim. The Court also finds that the respondents' conduct between March 23, 1956 and May 1, 1956, is not subject to criticism nor did such conduct in any improper or medical or legal sense aggravate libelant's condition.

25. Dr. Ferris, a general practitioner, was not called to the stand by respondents. His report (Exh. O), considered in the light of the total record, adds little to the case, one way or the other.

26. Dr. Ferris sent libelant to a radiologist, Dr. Constantine E. Foustanos. Dr. Foustanos was not called to the stand by respondents. The Court has carefully considered Dr. Foustanos' report (Exh. 29) in evaluating all of the evidence and resolving the issues.

The Court finds that, during said 33-day period (February 19, 1956 to March 23, 1956), the libelant was suffering from a cerebral concussion and multiple contusions to the head, neck, left shoulder and upper back. When he was discharged on March 23, 1956, however, he was still suffering from the effects of such injuries; and he was not fit for duty. The Norfolk Marine Hospital prognosis that he would be fit for duty in two weeks after March 23, 1956, was erroneous.

27. On May 1, 1956, he either fell or sat down in the street (Broadway and 44th Street) in a dazed condition. He was found "lying in street by" a police "officer in an apparent seizure" (Exh. 4). He was taken by ambulance to Roosevelt Hospital, where the diagnosis (Exh. 15) was entered on the record as "Neurological Disorder. ? Psychotic." and "? Neurological disorder."

28. At about 2 A. M., May 2, 1956, libelant was transferred by ambulance from Roosevelt Hospital and admitted to Bellevue Hospital.

29. Libelant remained as an in-patient at Bellevue Hospital, Psychiatric Division, for 16 days from May 2, 1956, until May 18, 1956, when he was discharged.

On May 2, 1956, when libelant was admitted, the hospital medical authorities had the following "impression," which was noted (Exh. 16, p. 2):

"Chronic brain syndrome head trauma."

On May 11, 1956, the orthopedic diagnosis (Exhibit 16, p. 6) was:

"Unstable low back of congenital origin with superimposed trauma."

On May 18, 1956, the "final diagnosis" upon discharge from Bellevue Hospital (which diagnosis was signed by one Dr. Stuart) was (Exh. 16, p. 1):

"Reactive depression. Improved."

30. On July 5, 1956, libelant was readmitted to Bellevue Hospital as an in-patient. He remained at this hospital until July 20, 1956, on which date he was transferred to Manhattan State Hospital by virtue of a New York Supreme Court commitment order.

While at Bellevue Hospital during the second admission period, and under date of July 9, 1956, Dr. Stuart noted libelant's condition as:

"Schiz. reaction par. [paranoid] type." (Exh. 16, p. 4).

On July 20, 1956, Dr. Stuart noted his "Final Diagnosis" (Exh. 16, p. 1) as:

"Schiz. React. Par. Type."

The Bellevue Hospital records show that the libelant was suffering from injuries to the back, which were producing marked spasm.

31. As noted on July 20, 1956, libelant was committed to Manhattan State Hospital by order of the New York Supreme Court. He remained at Manhattan State Hospital as an in-patient for 123 days, i. e., until December 1, 1956, on which date he was discharged (Exh. 17).

The admission diagnosis (Exh. 17) was:

"Schizophrenic reaction—paranoid type."

Under date of November 28, 1956 (Exh. 17, pp. 29, 35), the diagnosis was:

"Dementia praecox, other types (mixed psuedo-neurotic schizophrenia)."

His "condition" was noted as: "Recovered."

32. (a) At Manhattan State Hospital it was also noted that libelant had an orthopedic pathology involving his spine. He was given a back brace, which he wears to the present time.

(b) The Court finds that libelant had and has a congenital anomaly affecting the lowermost portion of the spine; that is, a lumbarization of the first sacral segment (s. m. pp. 1154, 1238–1239). As a proximate result of the accident herein, low back injuries were superimposed upon the congenitally weak back; and this trauma caused by the accident has produced a low back pathology consisting of a lumbar and lumbosacral sprain and a nerve root irritation in the lower back (s. m. pp. 1151, 1152, 1155, 1162, 1209–1210).

33. The Court does not accept the "clinical diagnosis" of libelant's orthopedist that libelant had or has a herniated or ruptured vertebral disc (s. m. pp. 1155, 1156, 1160, 1161, 1227). The weight of the credible evidence establishes that libelant did not and does not have any such condition.

34. Since about April 1957 and to date libelant has been attending the Bellevue Hospital mental hygiene clinic once a week. Under the date of April 18, 1957, the noted "impression" (Exh. 16) was: "Schiz. reaction of paranoid type subsided to an ambulatory level." Under date of May 16, 1957, the Bellevue authorities noted (Exh. 16): "somatic preoccupations of psychogenic origin * * * aspects of an ambulatory schizophrenia."

Since April 24, 1957, to date, libelant has been a private patient of Dr. A. B. Stuart, a psychiatrist, who is also a staff member of Bellevue Hospital and who originally had treated libelant while he was an in-patient at Bellevue. According to Dr. Stuart, who has seen libelant about fifty times, libelant had a "psychosis" (s. m. pp. 1703) known as "schizophrenia reaction of paranoid type," which now is in a "state of remission"; and that there is a high probability that, at some uncertain time in the future, libelant will have a recurrence of this psychosis (s. m. pp. 1327–1328, 1652–1653, 1703, 1708, 1714, 1722). Dr. Stuart testified that libelant "is not psychotic at the moment" (s. m. p. 1327) but that a distinction must be drawn between "recovered" and "state of remission," the latter term meaning temporary recovery (s. m. pp. 1715–1728).

On the other hand, the respondents' psychiatric expert (who examined libelant in December 1956 and August 1957) diagnosed libelant as: "definitely non-psychotic;" suffering from a "traumatic psychoneurosis, conversion hysteria" with "a tendency to malinger" (s. m. pp. 2172, 2175); "Psychoneurosis with malingering characteristics" (s. m. pp. 2266, 2307, 2390–2391); a condition that he now has (s. m. p. 2307) but that will

completely disappear as soon as this case is over and he returns to Greece.

35. On August 21, 1957, libelant was examined at Staten Island Marine Hospital at the request of the United States Immigration Service. The doctor there, after reviewing the medical records and after examining libelant, reported (Exh. 26):

"Patient seems to be suffering from a post-traumatic personality disorder at times manifested by depression of psychotic proportions."

Upon the trial, respondents' psychiatric expert agreed with the foregoing diagnosis as applicable to the libelant until December 1, 1956, when he was discharged as "Recovered" from Manhattan State Hospital.

According to respondents' expert libelant has now fully recovered from any psychiatric disorders causally related to the accident of February 19, 1956.

36. With regard to the respondents' medical proof, the Court points out that the only doctor called to the stand by respondents was their pyschiatric expert. This doctor has done work in other cases for the same underwriters who are interested in the present case (s. m. p. 2335). He sat in court for seven full days during the trial, acting as part of the circle of advocacy in behalf of the respondents (s. m. pp. 2263, 2333–2335). To a substantial extent, his testimony in this case lacked scientific impartiality and objective neutrality. The Court does not accept his views as to the genesis, character and extent of libelant's past, present or future physical and mental condition.

Moreover, his testimony was not buttressed by the testimony of any other neurologist or psychiatrist in behalf of respondents. The other doctors (on whose statements, letters and reports respondents rely) have not been produced for cross-examination in open court. All of those other doctors (with the exception of Dr. Vorbrinck) are alive and available within the forum. Dr. Ferris, a general practitioner who examined libelant; and Dr. Foustanos, a radiologist who x-rayed libelant, are in this category. They, too, were company doctors, as was the situation with the late Dr. Vorbrinck. All of the foregoing factors have been considered in evaluating the medical testimony in behalf of the defense.

37. With respect to the medical testimony offered in behalf of libelant, the picture is different. In so saying, the Court emphasizes that there has been no wholesale acceptance of all of the medical contentions urged in behalf of libelant.

The Court has, both during the trial and after the conclusion of the trial, read every page of the various hospital records—those of the Norfolk Marine Hospital, Roosevelt Hospital, Bellevue Hospital, Manhattan State Hospital and Staten Island Marine Hospital.

Dr. Stuart (the same Dr. Stuart who made the entries in the Bellevue Hospital records, where he was a staff member in the Psychiatric Division) has had opportunity for a comprehensive medical study of this case. Nevertheless, the Court is firmly convinced that Dr. Stuart's testimony has exacerbated the picture of libelant's past and present condition; and his prognosis is unduly pessimistic. The Court does not accept his views that libelant was and is suffering from the incurable psychosis of schizophrenia, said now to be in a state of remission, and that libelant will never be able to return to work as an able-bodied seaman.

38. One of the implicit premises of the Court's evaluation of the psychiatrists' testimony herein has been expressed as follows in Carter v. United States, D.C.Cir. 1957, 252 F.2d 608, 617:

"Unexplained medical labels— schizophrenia, paranoia, psychosis, neurosis, psychopathy—are not enough. Description and explanation of the origin, development and manifestations of the alleged disease are the chief functions of the expert witness. The chief value of an expert's testimony in this field, as in all other fields, rests upon the mate-

rial from which his opinion is fashioned and the reasoning by which he progresses from his material to his conclusion; in the explanation of the disease and its dynamics, that is, how it occurred, developed, and affected the mental and emotional processes of the defendant; it does not lie in his mere expression of conclusion."

In the case at bar, the Court has closely studied the reasoning by which the psychiatrists have reached their respective conclusions and the data upon which their conclusions were predicated.

39. These diametrically opposed prognoses suggest that, to a not inconsiderable extent, psychiatric interpretation involves the method of eisegesis. There is a wide area for the psychiatrist's use of creative imagination, insight, judgment, and choice of terms and emphasis in reaching and explaining his diagnosis and prognosis. Respondents' psychiatrist so stated (s. m. p. 2511).

Upon the Court rests the responsibility for distinguishing between genuine scientific skill employing words of art and mere verbal dexterity employing the art of words.

The warning has been sounded against needlessly embarking—"without a pilot, rudder, compass or radar—on an amateur's voyage on the fog-enshrouded sea of psychiatry" (Frank, J., concurring, United States v. Flores-Rodrigues, 2 Cir., 237 F.2d 405, 412).[1]

But the courts, in the cited case as well as in others, are compelled—with or without benefit of jury—to deal with and to evaluate medical proof.

The "rapid and recognized advance of the science of psychiatry" (Conrad, Psychiatric Lie Detection, 1958, 21 F.R. D. 199, 205, 214–216) has frequently

been judicially recognized. See, e. g., Leland v. State of Oregon, 1952, 343 U.S. 790, 800, 72 S.Ct. 1002, 1008, 96 L.Ed. 1302 ("The science of psychiatry has made tremendous strides * * *"); United States v. Hiss, D.C.S.D.N.Y. 1950, 888 F.Supp. 559. Cf. United States v. Rosenberg, D.C.S.D.N.Y.1952, 108 F.Supp. 798, 806; Andersen v. United States, 9 Cir., 1956, 237 F.2d 118, 119. See authorities collected in Berman, Is It Time to Revise the McNaughton Rule Relating to the Defense of Insanity in Criminal Law? (1957) N. Y. State Bar Bulletin, 407 et seq.

In Leland v. State of Oregon, supra, Mr. Justice Frankfurter, dissenting, said (343 U.S. at page 803, 72 S.Ct. at page 1009):

"Sanity and insanity are concepts of incertitude. They are given varying and conflicting content at the same time and from time to time by specialists in the field."

Professional literature for lawyers specializing in personal injury cases recognizes the current importance of forensic psychiatry. See, for example, authorities cited in Barry et al., Brain and Spinal Cord Injuries Related to Trauma, Insurance Counsel Journal, XXIV, No. 3 (July 1957) 272 et seq.; Fix and Murphy, Psychosomatic Problems Relating to Trauma, Insurance Counsel Journal, supra, 282 et seq.; Baker, Traumatic Neuroses, Insurance Counsel Journal XXV, No. 1 (January 1958) 88 et seq.; Polsky, The Medico-Legal Reader (1956) Chapter II, Law and The Mind. The New York State Association of Plaintiff's Trial Lawyers recently presented a two-day seminar on the medico-legal problems connected with "trauma related to psychosis." The Plaintiff's Advocate (January 1958) vol. 2, no. 5, p. 3.[2]

---

1. Notwithstanding this view, one of the late Judge Frank's proposals "was a requirement that judges be psychoanalyzed, and that they be subject to recall on the basis of the analyst's report, which would be made a matter of public record." Transcript of Memorials for Judge

Jerome N. Frank (Ass'n of the Bar of the City of New York and New York County Lawyers Ass'n 1957) p. 29.

2. The psychiatric problems posed in this case are illustrative of the general fact that increasingly the courts will be called

In the present case there is more to the medical proof than the testimony of the rival psychiatrists. There are full hospital records of the Norfolk Marine Hospital, Bellevue Hospital, Manhattan State Hospital and Staten Island Marine Hospital. There are the reports and letters of three company doctors: Dr. Vorbrinck, Dr. Ferris and Dr. Foustanos. In addition, there is the testimony of libelant's orthopedic surgeon; the testimony of an eye witness, Aris Katsanikakis, put on the stand by libelant and who described not only the happening of the accident but also libelant's condition immediately after the accident (s. m. pp. 8, 9, 11, 13, 14, 17, 19–22, 24, 26, 44–47, 72); the entry in the logbook of the vessel, and, in full detail, the testimony of libelant himself.

An eminent dermatological surgeon (s. m. pp. 1816–1817), appointed by the Court with the consent of both sides, has examined certain scar tissue on libelant's face and other parts of his body, and has rendered a report (s. m. pp. 1524–1526).

Libelant was examined and cross-examined exhaustively for days during the trial. Every fact and facet of his life has been scrutinzed by the physicians and lawyers, and placed in the trial record.

■ 40. Sifting all of the medical proof in the case and subjecting it to a searching qualitative analysis, the Court finds and concludes:

(a) Libelant has suffered and is suffering from a temporary traumatic neurosis and from temporary low back injuries that are both somatic and psychogenic.

(b) These psychic and somatic injuries were proximately caused and competently produced by the accident of February 19, 1956.

(c) These injuries were, at first, severe but have gradually improved and are gradually disappearing.

(d) It is a matter of reasonable foreseeability that libelant probably will have completely recovered from all signs, symptoms, complaints, and injuries resulting from the accident in two years; that is, on or about March 1, 1960.

(e) On or about March 1, 1960, libelant will (i) be fit for his usual and customary work, (ii) attain maximum rehabilitation and the point of maximum possible medical cure, and (iii) achieve complete recovery.

41. In making the foregoing findings and reaching the foregoing conclusions, the Court has taken into consideration the following facts and circumstances, among others:

(a) The injuries causally attributable to the accident were superimposed upon libelant's low back anomaly of congenital origin.

(b) In or about 1949, when libelant was discharged from the Greek Army, he had "chronic nephritis" (Exh. SS). There is no evidence that he had the latter condition in any form or degree when he entered the employ of the respondents.

(c) In May 1955 and in August 1955 he had been in two accidents on another vessel, the Pandanassus. In the first of said accidents, he slipped and fell on his buttocks. In the second of said accidents, a rapidly uncoiling pipe or hose struck him in the lower abdomen or groin; and he suffered a double hernia, for which he was operated upon in 1955.

(d) Sometime thereafter, he suffered from amoebiasis or amoebic dysentery.

upon to deal with scientific questions in a juridical context. Out of the myriad available examples and putting aside patent litigation, one may cite the current bills in the New York State Legislature (N. Y. State Bar Association, Circular No. 123, February 24, 1958, p. 490; S.Int. 2647, Pr. 2823; A.Int. 3088, Pr. 3195; and A.Int. 1804, Pr. 1823) dealing with the techniques of subliminal perception in advertising. This proposed legislation would call upon the courts to interpret and apply such terms as "advertising below human consciousness," "the subconscious or unconscious minds of the audience," "the conscious minds of such audience" and "subliminal perception."

(e) However, there is no evidence that, at the time he entered respondents' employ, he was suffering from the results of the hernia operation or the amoebiasis. In fact, respondents' doctor, Dr. Panagiotis Stamatakis, of Piraeus, Greece, examined libelant on January 1, 1956, when he was ready to join the respondent-vessel, and found him to be "healthy and fit for work" (Exh. 24; s. m. p. 89).

The Court finds that libelant was fit for duty when he entered respondents' employment.

The psychic injuries causally attributable to the accident were superimposed upon libelant's "schizoid personality." The latter description was given by libelant's psychiatrist. The term "schizoid personality," however, is a description of a type of personality and not a diagnosis of a mental illness or disorder (s. m. pp. 1400, 1414–1416, 1419).

The Court finds that at the time of the accident, libelant was not suffering from any mental illness or disorder.

While the Court thus finds that, at the time of the accident, libelant was not suffering from any physical or mental disorders or illnesses, the Court has considered all of the foregoing data as part of the total medical picture for the purpose of correctly evaluating the elements of proximate causation and proximate damages.

42. The story (s. m. pp. 1985–1986, 2009, 2057) of the Vancouver port-serviceman about libelant's alleged ability to speak English in 1955 is highly implausible. That witness's testimony (s. m. pp. 1988, 1990, 1991, 1997, 2008, 2027) with reference to the alleged disturbance and other statements and acts by libelant is rejected as unreliable. This witness's testimony was invalidated by the photographs (Exhs. 37, 39, 44, 47) and the related evidence (s. m. pp. 2016ff; 2031; 2041, 2047, 2048) demonstrating that he really could not identify the libelant as distinguished from Kritikakis, libelant's Greek companion, during the 1955 Vancouver stay.

43. (a) The Liberian "Maritime Law" (Exhs. 27 and VV) provides:

"Insofar as it does not conflict with any other provision of this Title, the non-statutory general Maritime Law of the United States of America is hereby declared to be and is hereby adopted as the general Maritime Law of the Republic of Liberia."

(b) The Liberian "Maritime Law" further provides:

"All causes of action arising out of or under this Act are hereby declared and shall be cognizable before the Circuit Courts of the Republic, sitting in Admiralty,' but, except as otherwise specifically provided in this Act, the provisions of this Title shall not be deemed to deprive other Courts of Liberia or elsewhere, with jurisdiction to enforce such causes of action."

(c) The Liberian "Maritime Law" further provides:

"Nothing in these rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to carry lights or signals, to keep a proper look-out, or to take any precautions which shall be required either by the ordinary practice of seamen or by the special circumstances of the case."

(d) The "Injuries Law" of Liberia (Exhs. 27 and WW) provides:

"A tort or injury is an unlawful damage. Every act prejudicial to the interest of another is an injury unless it is warranted by law.

\*    \*    \*    \*    \*    \*

"An act may constitute any injury even though the actor did not intend to injure the person affected. An injury may be committed due to negligence, carelessness, or unskilfulness rather than any injurious design on the part of the injurer.

\* \* \* \* \* \*

"All persons, including married women, infants, and incompetents, are capable of committing injuries.

\* \* \* \* \* \*

"Every person is liable for all injuries committed by him, subject to the exceptions stated in this section.

\* \* \* \* \* \*

"Every employer or principal is liable for the injuries committed by his agents or servants while employed in his business.

\* \* \* \* \* \*

"The object of a civil action for injuries is to indemnify the injured person, not to punish the injurer; therefore, it follows that the measure of damages is the actual amount of the loss or inconvenience sustained by the injured person without any reference to the degree of misconduct of which the injurer may have been guilty. \* \* \*"

(e) Other provisions of the Liberian Code are correctly set forth in the exhibits as follows: title 16, "General Construction Law" (Exhs. 27 and XX); title 19, "Labor Law" (Exh. UU); title 6, "Civil Procedure Law" (Exh. YY [deemed marked]); and title 31, "Public Health and Safety Law" (Exh. ZZ [deemed marked]).

44. Libelant has performed no work since the date of the accident, February 19, 1956. Libelant will not be able to return to any gainful employment until on or about March 1, 1960. He is entitled to recover for loss of earnings during the period from February 19, 1956, to March 1, 1960, calculated on the basis of average annual earnings of $640 (s. m. pp. 1732–1734).

45. Libelant is entitled to recover, as an item of damages, the reasonable value of room and board he would have received and would receive as an incident of his actual employment as an able-bodied seaman, during the period from February 19, 1956, to March 1, 1960, calculated on the basis of eight months' employment per annum (s. m. pp. 1732–1734), less $90 unearned wages paid and $984 maintenance paid until February 16, 1957, inclusive, in accordance with Exhibit 14, as set forth in Finding of Fact number 46. Moreover, said reasonable value of room and board has been considered and deemed included within the award for maintenance and cure as set forth in Finding of Fact number 46, in order to avoid any duplication of recovery.

46. (a) Libelant is entitled to receive an amount representing maintenance and cure up to March 1, 1960, computed from February 17, 1957 (in accordance with the parties' agreement, Exh. 14) and calculated at the per diem rate of $6 for every day from and including February 17, 1957, until the date of the completion of the trial herein; and after said date, at the per diem rate of $3.50 (s.m.pp. 2915–2916).

(b) Pursuant to an agreement (Exh. 14) dated February 25, 1957, between the proctors for the parties, in compromise of a disputed wage penalty claim and claim for maintenance and cure, the respondents paid libelant the balance of earned wages in the sum of $19.21 to February 19, 1956, and maintenance and cure of $984 from February 19, 1956, to and including February 16, 1957.

(c) Respondents concede that they owe libelant wages to the end of the voyage, March 13, 1956, at Hamburg, a sum of $44. This amount has been offset against $90 paid to libelant toward unearned wages; and libelant does not now seek an allowance therefor (s.m.p. 2871).

(d) There is nothing due to libelant for earned wages (s.m.p. 1937).

47. Libelant is entitled to recover for past, present and future pain and suffering during the period from February 19, 1956, to about March 1, 1960.

48. Libelant is entitled to recover the amounts actually expended and liabilities incurred for hospital and medical expenses and the reasonably estimated amount of such expenses in the future to about March 1, 1960.

49. Libelant is entitled to recover $340, an amount representing the cost of return transportation (s.m.p. 1955), unless respondents agree to transport libelant, at their own expense, from New York to Piraeus, Greece, the port where respondents engaged the libelant.

50. Upon the last day of the trial (February 27, 1958), the attorneys for the respective parties formally stipulated (s.m.p. 2946) that the Court shall render a lump sum award that shall be inclusive of any maintenance and cure and any and all items of damage to which the Court may find and conclude the libelant is entitled.

51. (a) The Court has considered all of the items of general and special damage urged in behalf of libelant. Each item has been considered in the light of respondents' contrary contentions and in the light of the totality of the evidence. In making the lump sum award hereinafter stated, the Court has avoided any possible duplication of recovery.

(b) The Court has considered libelant's argument about the "inflationary spiral" and of the possibility of libelant's going on "to a higher rating with greater earnings" (s.m.p. 2872). The Court has considered respondents' contrary argument (s.m.p. 2899).

52. The Court awards to libelant as against respondents herein, the total sum of $25,000, which is all-inclusive of every item to which libelant is entitled to recover from respondents. A decree for said amount shall be entered accordingly.

Conclusions of Law

1. This Court has jurisdiction over the subject matter of this action and over the libelant and the respondents, S/S Mparmpa Christos and Seguridad Compania Naviera, S. A.

2. At all pertinent times, the respondent-vessel was a merchant vessel registered under the laws of the Republic of Liberia and flying the Liberian flag.

3. At all pertinent times, the respondent Seguridad Naviera, S. A., was a corporation organized and existing under the laws of the Republic of Panama.

4. At all pertinent times, the respondent Seguridad Naviera, S. A., was the owner of record of the respondent-vessel, and directly or through others, operated and controlled the said vessel.

5. At all pertinent times, among the agents who acted in behalf of the respondents for various purposes, were: Eagle Ocean Transport, Inc., a Delaware corporation; Boyd, Weir & Sewell, an American corporation; and Hasler & Company, of Norfolk, Virginia.

6. At all pertinent times, the respondents were engaged in foreign commerce, through charter arrangements.

7. At the time of the accident herein the respondent-vessel was in navigable waters in Hampton Roads, Virginia, and within the territorial jurisdiction of the United States of America.

8. At all pertinent times, the libeland was in the employ of the respondents as an able-bodied seaman on the respondent-vessel.

9. At all pertinent times, including February 19, 1956, the date of the accident herein, libelant was and is a citizen of Greece and domiciled in Greece. On the date of said accident, libelant was on the respondent-vessel while it was anchored in navigable waters in Hampton Roads, Virginia. Since the date of said accident (February 19, 1956) and up to the present, libelant has resided in the United States. He has never been admitted therein as an immigrant. He is presently subject to deportation (Exh. HH). His said residence in the United States and the temporary stay of deportation have been necessitated solely by the medical circumstances described in this opinion and the disposition of this litigation.

10. A general distinction must be drawn between:

(I) Cases dealing with the question (not involved herein) whether the District Court should exercise or has properly exercised its discretion to assume or refuse jurisdiction of a suit in ad-

miralty between foreign nationals (Koziol v. The Fylgia, 2 Cir., 1956, 230 F.2d 651; The Paula, 2 Cir., 1937, 91 F.2d 1001; Hansen v. A.S.D. S.S.V. Endborg, D.C.S.D.N.Y. 1957, 155 F.Supp. 387; The Fletero v. Arias, 4 Cir., 1953, 206 F.2d 267, 270–271; Romero v. International Terminal Operating Co., 2 Cir., 1957, 244 F.2d 409, affirming D.C., 142 F.Supp. 570; Catherall v. Cunard S. S. Co., D.C. S.D.N.Y. 1951, 101 F.Supp. 230; Jonassen v. United States, D.C.E.D.N.Y. 1952, 103 F.Supp. 862; Lunde v. Skibs, etc., D.C.S.D.N.Y. 1952, 103 F.Supp. 446, 447; Guitian v. S.S. Ciudad De Barquisimeto, etc., 1953 A.M.C. 210 [S.D.N.Y. 1952]; Johansson v. O. F. Ahlmark & Co., D.C. S.D.N.Y. 1952, 107 F.Supp. 70; Nakken v. Fearnley, D.C.S.D.N.Y. 1955, 137 F. Supp. 288, 1955 A.M.C. 2021; Dedegikas v. S.S. Athos, etc., 1955 A.M.C. 379, [D. Ore. 1954]), and

(II) Cases dealing with the question (involved herein) of what substantive law should be chosen and applied by the District Court, where there is no issue of jurisdiction (Lauritzen v. Larsen, 1953, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254; 2 Norris, The Law of Seamen, section 678 [1952]; Gardner, Remedies for Personal Injuries to Seamen, Railroadmen, And Longshoremen, 71 Harv.L.R. 438, 455–456, 459–460 [1958]; Plamals v. S. S. "Pinar De Rio", 1928, 277 U.S. 151, 153–155; The Paula, 2 Cir., 1937, 91 F. 2d 1001; Taylor v. Atlantic Maritime Co., 2 Cir., 1950, 179 F.2d 597; The Fletero v. Arias, 4 Cir., 1953, 206 F.2d 267, 272–273.

In dealing with the latter question of the choice of law, the courts have generally analyzed the problem by considering the following factual and legal features of the particular case: (1) the nature of the action, as one in admiralty or at law; (2) libelant's nationality or citizenship; (3) respondent-owner's nationality, citizenship or country of incorporation; (4)

the respondent-vessel's registration and flag; (5) the place of the accident, e.g., American or foreign waters or high seas; and (6) the place where the shipping articles were signed. Unless the foregoing features as they may be exemplified in the particular case, are kept in focus, the precise holding of a decision cannot accurately be stated.

In the case at bar: (1) the action is in admiralty; (2) libelant's nationality and citizenship are Greek; (3) the respondent-owner's country of incorporation is Panama; (4) the respondent-vessel's registration and flag are Liberian; (5) the accident took place in American territorial waters; and (6) the libelant was engaged in Greece; and he signed the shipping articles in Germany.

Under such circumstances, the Court's choice of law is that of the country of the ship's flag, Liberia.

11. Having concluded that the proper choice of law is that of Liberia, the Court now considers the interpretation of that law. Each of the parties has recognized that foreign law must be proved as a fact. The Liberian code provisions relied upon respectively by the parties have been put into evidence as the following exhibits:[3]

Exhibit 27 sets forth excerpts from title 17 ["Injuries Law"], title 22 ["Maritime Law"], and title 16 ["General Construction Law"];

Exhibit UU sets forth title 19 ["Labor Law"] sections 20, 21, 30, 31, 32, 73, 74;

Exhibit VV sets forth various sections in title 22 ["Maritime Law"];

Exhibit WW sets forth various sections in title 17 ["Injuries Law"];

Exhibit XX sets forth various sections in title 16 ["General Construction Law"];

Exhibit YY (deemed marked) sets forth title 6 ["Civil Procedure Law"] section 165; and

---

3. These excerpts are from Liberian Code of Laws of 1956 (adopted by the Legislature of the Republic of Liberia, March 22, 1956; prepared for the Republic of Liberia by the Liberian Codification Project, Cornell University, under direction of Milton R. Konvitz). The Code, set forth in three volumes published by Cornell University Press (1957), contains thirty-seven titles.

Exhibit ZZ (deemed marked) sets forth title 31 ["Public Health and Safety Law"] section 683.

The proctors for the parties have both briefed and orally argued the legal effect of the foregoing provisions. Experts on Liberian law have not been produced as witnesses because, according to the proctors (s.m.pp. 1137, 1140) experts, with respect to the questions involved herein, are not available. The Court has considered all of the parties' contentions advanced and has determined the issues thereby raised.

■ Libelant has correctly argued (s.m.pp. 1144–1145, 2956–2978, 2986) that, under Liberian law, libelant has claims both for "unseaworthiness" and "negligence."

The Court holds:

■ (A) An injured seaman has a cause of action for "unseaworthiness" as that term and doctrine are defined and applied by "the non-statutory general Maritime Law of the United States of America." (Liberian Code, Title 22, chapter 1, section 30 [Exhibits 27 and VV]), in so far as such general Maritime Law does not conflict with any other provisions of Title 22 of the Liberian Code.

(B) An injured seaman has a cause of action for "negligence" as that term is defined in the various applicable Liberian code provisions. (Liberian Code, Title 17, chapter 1, sections 1, 2, 10, 11 [Exhibits 27 and WW]). The integrated effect of these provisions is to spell out a doctrine of liability that is to be equated with the Anglo-American principles of common law tort liability for "negligence."

There is no merit to the respondents' argument[4] (s.m.pp. 2707, 2713–2727, 2948–2951, 2987–2990) that libelant's remedy is defined or limited by other Liberian code provisions (Exhibits UU, YY and ZZ).

12. Applying the applicable Liberian code provisions to the facts of this case, the Court finds and concludes that libelant has—as a matter of pleading, substantive law, and proof by the weight of the credible evidence—established claims against respondents for unseaworthiness and negligence.

■ 13. Under the material provisions of the Liberian law, there may be (and in this case there is) a cause of action by an employee-seaman (such as libelant herein) against the employer-vessel and the vessel's owner and operator (such as respondents herein) based upon negligence and upon unseaworthiness of the vessel (such as the unseaworthiness of the respondent-vessel herein and the negligence of the respondents herein). Such unseaworthiness is that which is comprehended within and pursuant to the principles of the General Maritime Law of the United States of America, as incorporated in Liberian law (Exhs. 27 and VV). Such negligence is that which is comprehended within and pursuant to the principles of the Liberian code provisions (Exhs. 27 and WW).

14. Contrary to libelant's contentions, the Court finds that the operations of the respondent-vessel were not substantially tied in with United States interests; nor were United States interests or contacts sufficiently shown to be involved as to make the substantive law of the United States of America applicable. See Lauritzen v. Larsen, 1953, 345 U.S. 571, 581, 73 S.Ct. 921, 97 L.Ed. 1254.

The policy underlying the traditional solicitude of the admiralty court for injured seamen is adequately recognized

---

4. This argument was a last-minute departure from respondents' opening statement (s. m. p. 3):

"The position of the claimant-respondent in this case is that the only issue, in so far as the accident itself is concerned, is one of seaworthiness. The law to be applied to this case is the Liberian Law and, under the Liberian law, the only right given to a seaman to recover damages is based on proof of unseaworthiness of the vessel." (Cf. s m. p. 593.)

and vindicated in this case by the application of Liberian law.

Whether the use of a "flag of convenience" (see Exh. 40 *for identification* [excerpt from the 1957 Year Book of the Encyclopaedia Britannica]) should be curbed or regulated is a matter of public policy, to be passed upon directly by the Congress and not obliquely by the courts.

The use of foreign incorporation for ship owners and the use of foreign registration and foreign flags for ships may well have great significance to the United States of America in terms of such public policies as those relating to taxation, protection of injured seamen, the status of organized labor among marine personnel, and the promotion of the American Merchant Marine. On the other hand, the problem is one that is pervaded with such elements as public and private international law and comity, and world trade. In dealing with these delicate and competing considerations of policy, the technique of Congressional investigation and enactment is to be preferred to that of judicial legislation. Cf. In the Matter of Sleep Products, Inc., Bankrupt, D.C.S.D.N.Y.1956, 141 F.Supp. 463, 469–470, affirmed sub nom. Local 140 Security Fund v. Hack, 2 Cir., 1957, 242 F.2d 375, certiorari denied 1957, 355 U.S. 833, 78 S.Ct. 51, 2 L.Ed.2d 45; United States v. Peltz, D.C.S.D.N.Y.1955, 18 F.R.D. 394, 407.

This Court has assessed the implications of the libelant's arguments on the subject of "flags of convenience" as a subterfuge and the asserted desirability of applying the Jones Act herein. The proposition cannot be debated in terms of black-letter reasoning. Factors of international law and commercial policy require the application of the law of the flag and not *lex loci delicti* or some other law. See Lauritzen v. Larsen, 1953, 345 U.S. 571, 577, 581–582, 584, 587–588, 592, 73 S.Ct. 921, 97 L.Ed. 1254.

■ 15. The substantive law of the State of Virginia or that of the Republic of Panama is inapplicable to this case. The provisions of the Jones Act (46 U.S. C.A. section 688) are inapplicable to this case.

16. The accident herein occurring on February 19, 1956 was proximately caused and competently produced by the unseaworthiness of the respondent-vessel and the negligence of the respondents.

17. (a) The injuries sustained by libelant as a result of the said accident were proximately caused and competently produced by the aforesaid unseaworthiness and negligence; and the respondents are liable to libelant therefor.

(b) Libelant was not guilty of contributory negligence.

18. As the proximate result of the aforesaid unseaworthiness and negligence, and without fault on libelant's part, libelant was caused to suffer (a) physical and mental injuries, (b) pain and suffering, (c) disabilities preventing him from being gainfully employed, (d) loss of wages and other financial benefits, (e) loss of return transportation, (f) expenses and liabilities for medical treatment and related items, (g) loss of maintenance and cure. Each of said items of damage and loss are considered (for purposes of fixing respondents' liability therefor) as continuing up to and terminating on March 1, 1960. Payments heretofore made by respondents against or on account of any of the foregoing items have been duly credited to respondents.

19. Respondents' motions to dismiss addressed to the amended libel are granted to the extent that the "First," "Second," "Third," "Fourth" and "Fifth" causes of action pleaded in the amended libel not based upon Liberian law are hereby dismissed with prejudice.

20. Process and an award shall be issued against the respondent-vessel *in rem* and against the respondent-owner *in personam*. A decree shall be entered accordingly herein in favor of libelant and against respondents, *in rem* and *in personam*, for damages and other benefits claimed, in the total sum of $25,000, together with costs and disbursements.

The foregoing shall constitute the Court's findings of fact and conclusions of law. Should either party desire additional findings or conclusions, these may be proposed upon notice to the other side within seven days from the date hereof.